Timothy **FRENCH**, Plaintiff, Appellant,

v.

**PAN AM EXPRESS, INC.,**
Defendant, Appellee.

No. 88–1450.

United States Court of Appeals,
First Circuit.

Heard Dec. 7, 1988.

Decided Feb. 23, 1989.

Amato A. DeLuca with whom Sandra A. Blanding and Revens & DeLuca, Warwick, R.I., were on brief, for plaintiff, appellant.

Lise M. Iwon and Laurence & Iwon, Wakefield, R.I., on brief, for Rhode Island Affiliate of American Civil Liberties Union, amicus curiae.

Julius C. Michaelson, Providence, R.I., for defendant, appellee.

Before COFFIN, BOWNES and SELYA, Circuit Judges.

SELYA, Circuit Judge.

In this case, the United States District Court for the District of Rhode Island granted the motion of defendant Pan Am Express, Inc. (Pan Am) for judgment on the pleadings. Fed.R.Civ.P. 12(c), 56. The sole issue presented on appeal is whether a state statute regulating the circumstances under which employers may require workers to submit to drug testing can fly in the face of the Federal Aviation Act (Act), 49 U.S.C. § 1301 *et seq.* (1982), as applied to airline pilots employed by interstate air carriers. We believe that, given the statutory and regulatory climate, the state law must be grounded, and we therefore affirm.

I

Inasmuch as the district court granted defendant's motion for judgment on the pleadings, we "must accept all of the non-movant's well-pleaded factual averments as true, and draw all reasonable inferences in his favor." *Rivera–Gomez v. de Castro,* 843 F.2d 631, 635 (1st Cir.1988) (citations omitted). We state the facts from that perspective.

It appears that Pan Am, an interstate airline, hired plaintiff-appellant Timothy French as a pilot in 1986. French's duties included flying commercial aircraft out of Green State Airport, Warwick, Rhode Island. In September 1987, Pan Am received word from the Warwick police department that French might have used marijuana while off duty. Defendant responded swiftly to the tip; its director of operations told plaintiff of the accusation and ordered him to submit to a urine test at a local hospital in order to confirm or dispel the suggestion. French balked, claiming that the directive violated R.I.Gen.Laws § 28–6.5–1, the text of which is set forth in full in the appendix. In plaintiff's view, the state statute was transgressed in at least two respects: (1) the employer lacked reasonable grounds to believe either that

French used drugs or that drug use was "impairing his ability to perform his job," *id.* at § 28–6.5–1(A); and (2) the proposed test was not to be "conducted in conjunction with a bona fide rehabilitation program," *id.* at § 28–6.5–1(C). Pan Am, unimpressed by these objections, fired him.

The plaintiff did not take lightly to his discharge. He filed suit in state superior court seeking a smorgasbord of relief, *e.g.*, damages, reinstatement, an order enjoining Pan Am from requiring him to submit to drug tests in violation of R.I.Gen.Laws § 28–6.5–1. The case was removed to federal district court. After certain preliminary skirmishing, not here material, the district court granted *brevis* disposition in Pan Am's favor. *French v. Pan Am Express, Inc.*, No. 87–0517B (D.R.I. Apr. 8, 1988) (*ore tenus* decision), *reprinted in* Record Appendix at 38–45.[1] This appeal followed.

## II

Congress's power to preempt state law derives from the Supremacy Clause of Article VI of the Constitution. *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 368, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986). Preemption may be express or implied. *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 95, 103 S.Ct. 2890, 2899, 77 L.Ed.2d 490 (1983); *Palmer v. Liggett Group, Inc.*, 825 F.2d 620, 625 (1st Cir. 1987). Either way, the question of whether federal law preempts a state statute is one of congressional intent. *California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 280, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1987); *Wardair Canada v. Florida Dep't of Revenue*, 477 U.S. 1, 6, 106 S.Ct. 2369, 2372, 91 L.Ed.2d 1 (1986); *Louisiana Pub. Serv. Comm'n*, 476 U.S. at 369, 106 S.Ct. at 1899; *United States v. Smith*, 726 F.2d 852, 859 (1st Cir.), *cert. denied*, 469 U.S. 841, 105 S.Ct. 143, 83 L.Ed.2d 82 (1984). Express preemption is exactly that: state laws are blunted by explicit direction of Congress. Implied preemption is a more

subtle creature. The Supreme Court has described it as follows:

... Congress implicitly may indicate an intent to occupy a given field to the exclusion of state law. Such a purpose properly may be inferred where the pervasiveness of the federal regulation precludes supplementation by the States, where the federal interest in the field is sufficiently dominant, or where "the object sought to be obtained by the federal law and the character of obligations imposed by it ... reveal the same purpose." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). Finally, even where Congress has not entirely displaced state regulation in a particular field, state law is pre-empted when it actually conflicts with federal law.

*Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 108 S.Ct. 1145, 1150, 99 L.Ed.2d 316 (1988).

The concept of implied preemption has a certain protean quality, which renders pigeonholing difficult. At bottom, the categories of which the cases speak are little more than analytic approaches which may be mixed and matched to meet the discernible needs of a particularized inquiry. Rather than embroiling ourselves in an unending search for meticulousness in labeling, and the diminishing returns which such a search necessarily entails, we prefer to take a more functional approach. In so doing, we abjure taxonomy for taxonomy's sake, and focus instead on the effect which the challenged enactment will have on the federal plan. As we said in *Palmer*: "If the state law disturbs too much the constitutionally declared scheme—whether denominated as 'occupying the field' or 'actually conflicting with federal law'—it will be displaced through the force of preemption." 825 F.2d at 626.

## III

Pan Am's primary assertion is that the Federal Aviation Act impliedly preempts state laws such as R.I.Gen.Laws

---

1. For ease in reference, we cite to this unpublished bench decision as "D.Ct.Op.", followed by a designation of the page(s) in question as numbered in the record appendix.

§ 28–6.5–1. Thus, we turn directly to that proposition.[2] Our assessment of it proceeds against the methodological backdrop limned above.

#### A.

At the outset, we note that appellant has offered us an easy way out—but we cannot accept it. The Act specifically prohibits states from enacting or enforcing laws relating to "rates, routes, or services of any air carrier ... [in] interstate air transportation." 49 U.S.C.App. § 1305(a)(1). French seizes on this language and urges that the Act, "by specifically defining certain areas of aviation which Congress intended to preempt, implies that Congress intended to limit the areas preempted to those named." Appellant's Brief at 11. Yet the siren song is hopelessly off-key. Even if we assume *arguendo* that section 1305(a)(1)'s reference to "services" does not *expressly* preempt the Rhode Island statute—a matter not entirely free from doubt, *cf., e.g., O'Carroll v. American Airlines*, 863 F.2d 11 (5th Cir.1989) (per curiam) (airline passenger's state-law claims following ejectment from flight held expressly preempted by section 1305)—the provision affords no basis for concluding that Congress meant to leave states free to regulate on all other issues anent air safety and pilot fitness. Indeed, in *City of Burbank v. Lockheed Air Terminal*, 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973), the Court seems to have rejected such an interpretation of section 1305, at least by necessary implication. *See id.* at 633, 93 S.Ct. at 1859. We must therefore, probe more deeply.

#### B.

In the interest of air safety, the Act assigns the overall responsibility for prescribing rules governing such matters as pilot qualification to the federal Secretary of Transportation (Secretary). The Secretary is charged with the duty of promulgating

> ... reasonable rules and regulations governing, in the interest of safety, the maximum hours or periods of service of airmen [defined to include pilots] ...; and
> ... [s]uch reasonable rules and regulations ... governing other practices, methods, and procedure, as the Secretary of Transportation may find necessary to provide adequately for national security and safety in air commerce.

49 U.S.C.App. § 1421(a)(5), (6). This delegation of power is as deep as it is wide; it is circumscribed only in that the Secretary is mandated to "give full consideration to the duty resting upon air carriers to perform their services with the highest possible degree of safety...." 49 U.S.C.App. § 1421(b).

In the area of pilot qualification, the Act specifies the Secretary's role in great detail. The Act makes it unlawful for anyone to pilot a commercial aircraft without an "airman certificate" (AC) or in violation of the terms of an AC. *See* 49 U.S.C.App. § 1430(a)(2). The authority to issue ACs and to specify their terms devolves upon the Secretary. *See* 49 U.S.C.App. § 1422(a). In fulfilling this mission, the Secretary, among other things, must prescribe physical qualifications for pilots' certification; he may not issue an AC short of finding "that [the applicant] possesses proper qualifications for and is physically able to perform the duties pertaining to, the position for which the airman certificate is sought." 49 U.S.C.App. § 1422(b). The Secretary must likewise provide for recertification to ensure air safety. ACs must contain "such terms, conditions and limitations as to duration thereof, periodic or special examinations, tests of physical fitness, and other matters as the Secretary of Transportation may determine to be nec-

---

**2.** We find it unnecessary to test the express preemption waters. After all, the district court based its decision on implied preemption, *see* D.Ct.Op. at 43 ("applying this statute to Pan Am in these circumstances conflicts with certainly what the federal policy is, conflicts certainly with what the airline's responsibility is under federal law"), and we think the decision plainly sustainable on that ground. We need not go further. *See Palmer*, 825 F.2d at 625 (because court has "no hesitation in determining that the Act impliedly preempts" claim, it need not deal with express preemption).

essary to assure safety in air commerce." *Id.*

The intricate web of statutory provisions affords no room for the imposition of state-law criteria vis-a-vis pilot suitability. We therefore conclude, without serious question, that preemption is implied by the comprehensive legal scheme which imposes on the Secretary of Transportation the duty of qualifying pilots for air service.

### C.

The regulations promulgated by the Secretary under the Act bulwark our finding that Congress intended to occupy the field of pilot regulation related to air safety, and thus confirm our statutory interpretation. That these regulations are properly before us is beyond peradventure: "Where ... Congress has entrusted an agency with the task of promulgating regulations to carry out the purposes of a statute, as part of the pre-emption analysis we must consider whether the regulations evidence a desire to occupy a field completely." *R.J. Reynolds Tobacco Co. v. Durham County*, 479 U.S. 130, 149, 107 S.Ct. 499, 511, 93 L.Ed.2d 449 (1986) (citations omitted); *see also Hillsborough County v. Automated Medical Labs, Inc.*, 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985).[3] In this case, the regulations, read in conjunction with the Act itself, likewise evince the presence of an imbricated federal scheme for monitoring pilot fitness in the interest of air safety and dovetail neatly with what we believe to be Congress's intent to preempt state law in this area.

Pursuant to powers and duties granted under the Act, the Secretary has prescribed the medical standards which an airline pilot must meet before he will be certified. Specifically, the regulations require that an aspirant not have a medical history or clinical diagnosis of, among other things, drug dependency, 14 C.F.R. § 67.13(d)(i)(d) (1988), nor any other "medical condition that the Federal Air Surgeon finds ... makes the applicant unable to safely perform [his] duties...." *Id.* at § 67.13(ii)(a). To enforce this requirement, the Federal Air Surgeon is authorized to "[e]xamine applicants for and holders of medical certificates for compliance with" the ban on drug addiction, among other applicable medical standards. *Id.* at § 67.25(a)(1). The long reach of the Secretary's authority in this field is graphically revealed by the regulation which declares that "no person may act as [a pilot] ... unless he has in his personal possession an appropriate current medical certificate...." *Id.* at § 61.3(c).[4]

The section of the regulations which impinges most directly on R.I.Gen.Laws § 28-6.5-1 is entitled "Alcohol or Drugs." It provides in pertinent part that "[n]o person may act ... as a crewmember of a civil aircraft ... (3) while using any drug that affects the person's faculties in any way contrary to safety." 14 C.F.R. § 91.11(a)(3). The regulations tell us:

> Whenever the Administrator has a reasonable basis to believe that a person may have violated [the prohibition against drug use] that person shall, upon request by the Administrator, furnish the Administrator, or authorize any clinic, hospital, doctor, or other person to release to the Administrator, the results of each test taken within four hours after acting or attempting to act as a crewmember that indicates the presence of any drugs in the body.

---

**3.** In *Hillsborough*, the Court styled itself "reluctant to infer pre-emption from the comprehensiveness of regulations." 471 U.S. at 717, 105 S.Ct. at 2377. There, however, the agency in question, when it initially promulgated regulations, had explicitly stated its intention not to preempt state law. *Id.* at 714, 105 S.Ct. at 2375. The issue in *Hillsborough* thus became whether regulations adopted subsequent to that disclaimer evinced a change in intent. *Id.* at 716, 105 S.Ct. at 2376. In the case at bar, there is no such hurdle to be cleared.

**4.** It is also noteworthy, we think, that the Secretary has required airlines to maintain a training program for pilots. *See* 14 C.F.R. § 121.400 *et seq.* Before participating in the training program, instructors must themselves be trained in "the proper evaluation of pilot performance including the detection of ... (ii) personal characteristics that could adversely affect safety." 14 C.F.R. § 121.413. Once again, the expansiveness of the regulatory net is readily apparent.

14 C.F.R. § 91.11(d).[5] Given this statutory and regulatory mosaic, there can be scant doubt but that Congress intended fully to occupy the relevant field.

### D.

Although we think the matter clear from what has been said to this point, we go the extra mile. Preemption may, of course, be inferred from the goals of a federal statute. *See Schneidewind*, 108 S.Ct. at 1150. That principle is apposite here. A common sense appraisal of the Act's history and objectives erases any vestige of doubt as to displacement of state laws. In brief, "the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947).

The legislative history underlying the original Act stressed the importance of a single uniform system of regulation, especially with regard to air safety. The House Report explained, in a section entitled "Purpose of Legislation," that "[t]he administration of the new Federal Aviation Agency (1) would be given *full responsibility and authority* for the ... promulgation and enforcement of safety regulations...." H.R.Rep. No. 2360, 85th Cong., 2d Sess., 22, *reprinted in* 1958 U.S.Code Cong. & Admin.News 3741, 3741 (emphasis supplied). In a letter to the House Committee on Interstate and Foreign Commerce, included as part of the House Report, a representative of the Executive Branch characterized the impetus behind the proposed legislation as follows:

> It is essential that one agency of government, and one agency alone, be responsible for issuing safety regulations if we are to have timely and effective guidelines for safety in aviation.

*Id.* at 3761.

In sum, establishment of a single uniform system of regulation in the area of air safety was one of the primary "object[s] sought to be obtained" by passage of the Act. *Schneidewind*, 108 S.Ct. at 1150. We agree with the Second Circuit that: "The Federal Aviation Act was passed by Congress for the purpose of centralizing in a single authority—indeed, in one administrator—the power to frame rules for the safe and efficient use of the nation's airspace." *Airline Pilots Ass'n Int'l v. Quesada*, 276 F.2d 892, 894 (2d Cir.1960). It is hard to imagine an area of regulation that is more closely related to air safety than pilot qualification. And local restrictions on pilot qualification would make impossible the attainment of the centralized control and uniformity of design so plainly coveted by the Congress.

### E.

The caselaw, too, fits this same model. Perhaps closest in point is *Northwest Airlines, Inc. v. Gomez–Bethke*, 34 Emp.Prac. Dec. (CCH) ¶ 34,561 (D.Minn.1984) [1984 WL 1040]. There, the district court, after engaging in a scholarly and well-reasoned analysis of implied preemption, held that the Act forestalled application of a Minnesota statute which would have required Northwest Airlines to permit chemically-dependent pilots to return to flying duty. *Id.* at 34,502. In reaching this conclusion, Judge Murphy determined, correctly we believe, that "[t]he comprehensive nature of the federal regulatory scheme governing the issuance of airman certificates clearly indicates an intent on the part of Congress to occupy the field of pilot regulation." *Id.* at 34,501. The Ninth Circuit's decision in *World Airways, Inc. v. Int'l Bhd. of Teamsters*, 578 F.2d 800 (9th Cir.1978), flies much the same course. There, the court held that the Act, by "clearly plac[ing] the responsibility upon the airline to determine whether or not a pilot possesses the judg-

---

5. Although not in effect at the time of French's troubles, the recently promulgated rules requiring airlines to maintain anti-drug programs for employees who perform safety-related functions are completely consistent with Congress's intent to occupy the field of pilot regulation related to air safety. *See* 53 Fed.Reg. 47,024 (1988) (to be codified at 14 C.F.R. §§ 61, 63, 65, 121, 135). These regulations will *require* employers to conduct random drug testing, among other measures.

ment to serve as a Pilot-in-Command," *id.* at 803, preempted this particular area of aviation safety. For that reason, an arbitrator exceeded his authority in ordering the airline to retrain and consider for requalification a pilot-in-command who had been demoted for errors in judgment. *Id.* at 804.

Before leaving the caselaw, we remark the Supreme Court's reasoning regarding the need for uniformity anent the regulation of aviation noise, *see City of Burbank v. Lockheed Air Terminal,* 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973), and suggest that the same rationale applies here. In *Burbank,* the Court struck down a municipal anti-noise ordinance placing a curfew on jet flights from a regional airport. *Id.* at 626–40, 93 S.Ct. at 1856–63. Citing the "pervasive nature of the scheme of federal regulation," *id.* at 633, 93 S.Ct. at 1859, the majority ruled that aircraft noise was wholly subject to federal hegemony, thereby preempting state or local enactments in the field. In our view, the pervasiveness of the federal web is as apparent in the matter of pilot qualification as in the matter of aircraft noise. If we upheld the Rhode Island statute as applied to airline pilots, "and a significant number of [states] followed suit, it is obvious that fractionalized control ... would severely limit the flexibility of the F.A.A....." *Id.* at 639, 93 S.Ct. at 1862.

Moreover, a patchwork of state laws in this airspace, some in conflict with each other, would create a crazyquilt effect. It is simply unreasonable to hypothesize that Congress intended a commercial pilot on a Providence-to-Baltimore-to-Miami run to be subject to drug testing, say, in Maryland, but not in Rhode Island or in Florida. It is even more unreasonable to suppose that a federal qualification standard related to drug use or dependency could hold sway at one terminus of the run but be thwarted by state law at the other terminus. The regulation of interstate flight—and flyers—must of necessity be monolithic. Its very nature permits no other conclusion. In the area of pilot fitness as in the area of aviation noise, the Act as we read it "leave[s]

no room for ... local controls." *Id.* at 638, 93 S.Ct. at 1862.

### F.

One final argument is raised. French and the amicus claim that the objectives of the Federal Aviation Act and R.I.Gen.Laws § 28–6.5–1 are "not adverse" and that the "requirement of reasonableness at the inception of a drug test ... is echoed by the ... Act's own safety rules." Brief of Amicus Curiae at 10–11. That may be so—but it is beside the point. So long as occupation of an envisioned field was intended, "any state law falling within th[e] field is pre-empted." *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984). Put another way, once Congress has taken up occupancy, state laws attempting to regulate within the field "will be invalidated no matter how well they comport with substantive federal policies." L. Tribe, *American Constitutional Law,* § 6–27 at 497 (2d ed. 1988); *see also Silkwood,* 464 U.S. at 248, 104 S.Ct. at 621. The federal interest necessarily predominates, rendering states impotent to act.

As it applies to airline pilots like French, flying interstate routes, R.I.Gen.Laws § 28–6.5–1 lands squarely within the field of pilot regulation related to air safety. It is this precise field which we have concluded Congress intended to occupy to the exclusion of state law. Therefore, the state statute must yield to the force of federal law in the present context, notwithstanding that it is constructed upon values familiar to many and cherished by most, and notwithstanding that it may fit neatly within or alongside the federal scheme.

### IV

We infer from the Federal Aviation Act an unmistakably clear intent to occupy the field of pilot regulation related to air safety, to the exclusion of state law. In our judgment, such an intent is implicit in the pervasiveness of relevant federal regulation, the dominance of the federal interest, and the legislative goal of establishing a single, uniform system of control over air

safety. In this case, all flight plans lead to Washington.

We need go no further.[6] At the altitudes in question here, section 28–6.5–1 is far too discommoding to survive. In a nutshell, it "disturbs too much the congressionally declared scheme...." *Palmer*, 825 F.2d at 626. Because Congress has adequately evinced its intention to occupy the field of pilot regulation related to air safety, we regard R.I.Gen.Laws § 28–6.5–1 as impuissant in the present setting. We so hold.

AFFIRMED.

---

**6.** The amicus brief focuses largely on whether or not the drug screen which Pan Am demanded constituted an unreasonable intrusion into protected privacy interests. Such an inquiry soars into the wild blue yonder. Plaintiff's complaint was predicated solely upon R.I.Gen.Laws § 28–6.5–1. Given our finding that the state statute was preempted, *see supra* Part III, arguments concerning the reasonableness *vel non* of the parties' conduct are irrelevant.

**8**

# APPENDIX

## CHAPTER 6.5

### URINE AND BLOOD TESTS AS A CONDITION OF EMPLOYMENT

SECTION.
28-6.5-1.  Urine and blood testing generally
          prohibited.

SECTION.
28-6.5-2.  Severability.

**28-6.5-1.  Urine and blood testing generally prohibited. —** No employer or agent of any employer shall, either orally or in writing, request, require or subject any employee to submit a sample of his urine, blood or other bodily fluid or tissue for testing as a condition of continued employment. Nothing herein shall prohibit an employer from requiring a specific employee to submit to such testing if:

(A) the employer has reasonable grounds to believe based on specific objective facts, that the employee's use of controlled substances is impairing his ability to perform his job; and

(B) the employee provides the test sample in private, outside the presence of any person; and

(C) the testing is conducted in conjunction with a bona fide rehabilitation program; and

(D) positive tests are confirmed by means of gas chromatography/mass spectrometry or technology recognized as being at least as scientifically accurate; and

(E) the employer provides the employee, at the employer's expense, the opportunity to have the sample tested or evaluated by an independent testing facility and so advises the employee; and

(F) the employer provides the employee with a reasonable opportunity to rebut or explain the results.

Any employer who subjects any person employed by him to such a test, or causes, directly or indirectly, any such employee to take such a test, except as provided for by this chapter, shall be guilty of a misdemeanor punishable by a fine of not more than one thousand dollars ($1,000) or not more than one (1) year in jail, or both.

In any civil action alleging a violation of this section, the court may:

(1) award punitive damages to a prevailing employee in addition to any award of actual damages; and

(2) award reasonable attorneys' fees and costs to a prevailing employee; and

(3) afford injunctive relief against any employer who commits or proposes to commit a violation of this section.

(G) Nothing in this chapter shall be construed to impair or affect the rights of individuals under chapter 5 of this title, the "state fair employment practices act."

**28-6.5-2.  Severability. —** If any provision of this chapter or the application thereof to any person or circumstances is held invalid, such invalidity shall not affect other provisions or applications of the chapter, which can be given effect without the invalid provision or application and to this end the provisions of this chapter are declared to be severable.