**YELLOW FREIGHT SYSTEM, INC.**

v.

**Jeffrey L. AMESTOY, Attorney General of the State of Vermont.**

**Jeffrey L. AMESTOY, Attorney General of the State of Vermont**

v.

**YELLOW FREIGHT SYSTEM, INC.**

Civ. A. No. 88–160.

United States District Court,
D. Vermont.

April 25, 1990.

Jeffrey Ivan Pasek, Cohen, Shapiro, Polisher, Shiekman & Cohen, Philadelphia, Pa., Martin K. Miller and John Kassel, Miller, Eggleston & Rosenberg, Burlington, Vt., and Ronald E. Sandhaus, Overland Park, Kan., for plaintiff.

Andrew MacLean, Asst. Atty. Gen., State of Vt., Montpelier, Vt., for defendant.

COFFRIN, District Judge.

Yellow Freight System, Inc. ("Yellow Freight") filed this action seeking declaratory and injunctive relief against the Attorney General of Vermont ("Defendant"). Defendant subsequently commenced an enforcement proceeding as a counterclaim against Yellow Freight. Yellow Freight requests that we declare the Vermont Drug Testing Act, Vt.Stat.Ann. tit. 21, § 511 *et seq.* (the "Act"), to be unconstitutional and preempted by federal law. Yellow Freight further prays that we enjoin Defendant from enforcing the Act's provisions in the instant case. Yellow Freight has moved for summary judgment pursuant to Fed.R.Civ.P. 56 on all its claims. Defendant has moved for summary judgment on seven of Yellow Freight's eight claims. For the reasons that follow, Yellow Freight's motion is granted and Defendant's motion is denied.

## BACKGROUND

Yellow Freight operates a trucking business spanning all fifty states and Canada. Dennis Wortheim was employed as a truck driver at Yellow Freight's terminal in Rutland, Vermont. On February 5, 1988, Yellow Freight required Wortheim to undergo a drug test as part of his federally mandated biennial physical examination. The drug test was conducted in accordance with collectively bargained, company-wide procedures.

The Federal Highway Administration ("FHWA") has promulgated a set of federal motor carrier safety regulations (the "FMCSRs"). The FMCSRs require drivers such as Wortheim to undergo a medical examination at least every two years so that they may be certified as physically qualified to operate a motor vehicle. 49 C.F.R. § 391.45(b). If, at any time, a driver is no longer qualified to operate a motor vehicle, he is not permitted to continue driving. 49 C.F.R. § 391.11(a). The FMCSRs direct, *inter alia,* that a driver is not physically qualified to operate a motor vehicle if he uses specified drugs. 49 C.F.R. § 391.41(b)(12).

Yellow Freight includes a drug test as part of the mandatory biennial examination. Regardless of whether a drug test is conducted, urinalysis is a compulsory part of these examinations. 49 C.F.R. § 391.43(c). The collectively bargained National Master Freight Agreement (the "Agreement"), which was negotiated by the Teamsters Union and the freight industry, established the procedures for Yellow Freight's mandatory drug testing program.

Wortheim tested positive for marijuana and was temporarily suspended without pay pending his enrollment in, and completion of, a drug rehabilitation program. On March 30, 1988, at the end of the rehabilitation program, Wortheim was again tested for drugs. This time he tested negative and was reinstated. Defendant's office subsequently informed Yellow Freight that its testing of Wortheim for drugs was a violation of Vermont law. Pursuant to the Agreement, Yellow Freight later randomly retested Wortheim, this time in New York. Wortheim again tested positive, so he was terminated by Yellow Freight.

In 1987, the Vermont General Assembly enacted wide-ranging legislation regarding employee drug testing. *See* Vt.Stat.Ann. tit. 21, § 511 *et seq.* The Act proscribes drug testing as a condition of employment. § 513(a). It also prohibits random or company-wide drug testing unless such testing is "required by federal law or regulation." § 513(b). The only exception to this general proscription is when the employer "has probable cause to believe the employee is using or is under the influence of a drug on the job ...." § 513(c)(1). The Act also prescribes certain confidentiality requirements and mandates specific drug testing procedures. §§ 514, 516. The employer must make a "bona fide rehabilitation program" available to employees the first time they test positive. § 513(c)(2, 3). The Act can be enforced by the State, with potential civil and criminal penalties, or by means of a private cause of action. § 519.

Defendant informed Yellow Freight that its employee drug testing policy violated

the Act. Defendant also threatened to file an enforcement suit against Yellow Freight unless it compensated Wortheim for the wages he was not paid during his suspension. Yellow Freight responded by filing this suit. Defendant then instituted its enforcement action against Yellow Freight as a counterclaim.

Yellow Freight's eight claims against Defendant are essentially based upon three legal theories. First, Yellow Freight claims that the Act is preempted by federal law. Specifically, Yellow Freight claims the Act is preempted by the FMCSRs, the Labor Management Relations Act (the "LMRA"), the National Labor Relations Act (the "NLRA"), and the Employee Retirement Income Security Act ("ERISA"). Second, Yellow Freight contends that the Act violates the Commerce Clause. Third, Yellow Freight avers that development of its drug testing program under the direction of a forensic toxicologist exempts Yellow Freight from operation of the Act by the Act's own terms. For the reasons that follow, Yellow Freight's motion is granted because the FMCSRs preempt operation of the Act in the instant case.

## DISCUSSION

Under the Supremacy Clause,[1] federal law may supplant state law in a number of different contexts. If Congress enacts a statute pursuant to its power to regulate interstate commerce, state laws regarding the same subject matter may be preempted by express statutory terms. *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). While explicit preemptive language is not necessarily required, "courts should not lightly infer preemption...." *International Paper Co. v. Ouellette*, 479 U.S. 481, 491, 107 S.Ct. 805, 811, 93 L.Ed.2d 883 (1987). The Supreme Court has stated: "In the absence of express pre-emptive language, Congress' intent to pre-empt all state law in a particular area may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the in-

ference that Congress 'left no room' for supplementary state regulation." *Hillsborough County v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)).

"Even where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent it actually conflicts with federal law." *Hillsborough*, 471 U.S. at 713, 105 S.Ct. at 2375. The Supreme Court has held that such a conflict exists either when "compliance with both federal and state regulations is a physical impossibility ...," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), or when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). "This inquiry requires us to consider the relationship between state and federal laws as they are interpreted and applied, not merely as they are written." *Jones*, 430 U.S. at 526, 97 S.Ct. at 1310.

The FMCSRs establish minimum standards for motor carrier safety. Yellow Freight claims the FMCSRs preempt state laws, such as the Act, which bear on the qualification of commercial motor vehicle operators. At the outset, we note that "[f]ederal regulations have no less preemptive effect than federal statutes." *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982). *See also Hillsborough*, 471 U.S. at 713, 105 S.Ct. at 2375 ("state laws can be pre-empted by federal regulations as well as by federal statutes"). Therefore, if either the FMCSRs or the statutes giving rise to them satisfy the requirements of federal preemption analysis, the Act is nullified with regard to Yellow Freight.

The FMCSRs derive primarily from two statutes. 49 U.S.C. § 3102(b)(1) directs

---

**1.** "Th[e] Constitution, and the Laws of the United States which shall be made in Pursuance thereof ..., shall be the supreme Law of the Land...." U.S. Const. art. VI, cl. 2.

that "[t]he Secretary of Transportation may prescribe requirements for ... qualifications ... of employees of, and safety of operation and equipment of, a motor carrier...." The Secretary of Transportation is also authorized to promulgate regulations by the Motor Carrier Safety Act of 1984.[2] In that legislation, Congress directed that the Secretary "shall establish minimum Federal safety standards for commercial motor vehicles and shall, at a minimum, ensure that ... the physical condition of operators of commercial motor vehicles is adequate to enable them to operate such vehicles safely...." 49 U.S.C.App. § 2505(a)(3).

These enabling statutes clearly contemplate the promulgation of regulations governing motor carrier safety in general, and the minimum qualifications of drivers in particular. These statutes do not *expressly* preempt state law, though. Nor do they evince an intent to occupy the field completely since the concept of "minimum standards" suggests the possibility of supplemental standards imposed by the states. However, any such state standard would have to be genuinely supplemental. Otherwise, in the words of the *Hines* Court, it would stand as an obstacle to the accomplishment and execution of the full purposes and objectives of the FMCSRs.

It is evident that compliance with both the Act and the FMCSRs was possible. However, the relevant question is whether the Act's general proscription against employee drug testing without probable cause hinders the regulatory scheme that the FHWA established. Accordingly, we look

to the regulations themselves to see if we can discern an intent to preempt laws restricting the *methods* by which motor carriers may ensure their drivers are qualified to drive. *See R.J. Reynolds Tobacco Co. v. Durham County*, 479 U.S. 130, 149, 107 S.Ct. 499, 511, 93 L.Ed.2d 449 (1986). Whether the agency failed to chart a less preemptive course is not important. *Fidelity Federal*, 458 U.S. at 154, 102 S.Ct. at 3022–23. Instead, we must focus on the presence, or lack, of preemptive intent on the part of either Congress or the FHWA.

The FMCSRs in effect at the time of Wortheim's drug test did not require the drug testing of drivers.[3] However, they did, and still do, require a biennial physical examination to ascertain whether a driver is physically qualified according to the terms of 49 C.F.R. § 391.41. Section 391.-41 lists thirteen requirements that must be satisfied for a driver to be deemed "physically qualified." One of the thirteen requirements is that the driver "[d]oes not use a Schedule I drug or other substance identified in Appendix D to this subchapter, an amphetamine, a narcotic, or any other habit-forming drug." 49 C.F.R. § 391.41(b)(12). The FMCSRs further state: "A person shall not drive a motor vehicle unless he is physically qualified to do so...." 49 C.F.R. § 391.41(a).

By the express terms of the FMCSRs, a driver who uses drugs is not physically qualified to drive, and thus is not permitted to drive a commercial motor vehicle. Both employer and employee have an affirmative duty to ensure that only qualified drivers operate commercial motor vehicles: "A

---

**2.** Pub.L. No. 98–554, 98 Stat. 2829 (1984).

**3.** The current FMCSRs *do* mandate the drug testing of commercial motor vehicle operators under certain circumstances. *See* 49 C.F.R. § 391.81 *et seq.* In particular, the FMCSRs now establish both the requirements and procedures for drug testing in five different situations:
    (1) reasonable cause, 49 C.F.R. §§ 391.99, 391.101;
    (2) pre-employment, 49 C.F.R. §§ 391.103, 391.107;
    (3) biennial physical examination, 49 C.F.R. §§ 391.105, 391.107;
    (4) random, 49 C.F.R. §§ 391.109, 391.111; and

    (5) post-accident, 49 C.F.R. §§ 391.113, 391.-115.
    Motor carriers such as Plaintiff, who employ fifty or more "testable" drivers, were required to have a mandatory drug testing program in place by December 21, 1989. All other motor carriers are given until December 21, 1990 to install such a program. *See* 53 Fed.Reg. 47,134 (Nov. 21, 1988). While the current FMCSRs do establish the requirements and procedures for drug testing in the situations delineated above, additional relevant diagnostic tests, including the administration of urine drug screens, still are not foreclosed.

person shall not drive a motor vehicle unless he is qualified to drive a motor vehicle. . . . [A] motor carrier shall not require or permit a person to drive a motor vehicle unless that person is qualified to drive a motor vehicle." 49 C.F.R. § 391.11(a). The relevant inquiry is whether the Act's ban of employee drug testing absent probable cause stands as an obstacle to the execution and accomplishment of the full purposes and objectives of the FMCSRs' requirement that motor carriers only permit qualified drivers to operate its commercial motor vehicles.

The FMCSRs contemplated the use of additional diagnostic tools such as drug testing without affirmatively requiring their use. Both the motor carrier and the physician conducting a driver's biennial physical examination are permitted to authorize the administration of additional diagnostic tests, such as drug screens. The motor carrier's ability to authorize such testing arises from its affirmative duty to ensure that only qualified drivers are operating its commercial motor vehicles. The examining physician's authority derives from his affirmative duty to ascertain the physical qualification of a driver before issuing a certificate. *See* 53 Fed.Reg. 7,280 (Mar. 7, 1988).

■ A federal regulatory scheme need not *require* the employment of certain practices to preempt state law restrictions of those practices. Instead, it is enough that the regulations choose to *permit* the practices for preemption to occur. A conflict between a federal regulation's allowance for certain practices and state law restrictions of those permissible practices "does not evaporate because the . . . regulation simply permits, but does not compel [the practices at issue]. . . ." *Fidelity Federal,* 458 U.S. at 155, 102 S.Ct. at 3023. *See also International Paper,* 479 U.S. at 494, 107 S.Ct. at 813 ("[a] state law is . . . pre-empted if it interferes with the methods by which the federal statute was designed to reach [its policy] goal").

The Supreme Court's analysis in *Fidelity Federal* is instructive. The Federal Home Loan Bank Board promulgated a regulation in 1979 that preserved the option of employing due-on-sale clauses in mortgages. *See* 12 C.F.R. § 545.8–3(f). The California Supreme Court, however, had previously limited the enforceability of such due-on-sale provisions in *Wellenkamp v. Bank of America,* 21 Cal.3d 943, 582 P.2d 970 (1978). The United States Supreme Court ruled that the federal regulation permitting due-on-sale clauses preempted the preexisting state law restriction on that mortgage device. In so holding, the Court relied upon express language in the regulations and accompanying statements by the promulgating agency that demonstrated an intent on the agency's part to preserve flexibility regarding the contractual provisions a mortgagee could employ. 458 U.S. at 155–56, 102 S.Ct. at 3023–24. While an intent to preserve flexibility may not be as clearly manifested in the express language of the FMCSRs as was the case in *Fidelity Federal,* statements by the FHWA make it abundantly clear that the FMCSRs were intended to permit the use of drug testing by motor carriers to ensure that drivers are physically qualified.

■ Courts are to accord substantial deference to a promulgating agency's interpretation of its own regulations: "In construing administrative regulations, 'the ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *United States v. Larionoff,* 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977) (quoting *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)). *See also Lyng v. Payne,* 476 U.S. 926, 939, 106 S.Ct. 2333, 2341, 90 L.Ed.2d 921 (1986) ("an agency's construction of its own regulations is entitled to substantial deference"); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965) ("[w]hen the construction of an administrative regulation rather than a statute is in issue, deference [to the promulgating agency's interpretation] is even more clearly in order"). In *Hillsborough,* the Supreme Court accorded substantial deference to the promulgating

agency's interpretation of the preemptive intent underlying its regulations: "The [agency's] statement is dispositive on the question of implicit intent to pre-empt unless either the agency's position is inconsistent with clearly expressed congressional intent, or subsequent developments reveal a change in that position." 471 U.S. at 714–15, 105 S.Ct. at 2376 (citation omitted).

The FHWA has interpreted the preemptive intent underlying the FMCSRs with respect to state law restrictions on employee drug testing.[4] The FHWA interprets the FMCSRs as follows:

(1) If a driver uses drugs, he is not qualified to drive. His employer has an affirmative duty to ensure that its drivers are qualified to drive. Thus, employers have an affirmative duty to ensure that its drivers do not use drugs. Urine drug screens are a relevant diagnostic test for determining whether a driver uses drugs, and urinalysis is already a part of the federally-mandated biennial examination. Motor carriers are empowered to authorize the administration of any relevant diagnostic test. *See* 53 Fed.Reg. 7,280 (Mar. 7, 1988). Therefore, the FMCSRs *permit* motor carriers to employ urine drug screens. Letter at 1–4.

(2) Due to the employer's affirmative duty to ensure that its drivers do not use drugs, any state restriction on a motor carrier's ability to prescribe urine drug screens as a diagnostic test of physical qualification would stand as an obstacle to the accomplishment of the full purposes and objectives of the FMCSRs. Therefore, any such state restriction is preempted by the FMCSRs. Letter at 5–6.

(3) A motor carrier's duty to ensure that a driver is physically qualified is a continuing one. Drug testing is one diagnostic tool for ascertaining the physical qualification of drivers. Limiting drug tests to those situations where the motor carrier has probable cause contravenes this continuing affirmative duty to prevent those who are not qualified to drive from driving

*at any time.* Therefore, a state's prohibition of employee drug testing absent probable cause is preempted by the FMCSRs. Letter at 6–7.

We find that the FHWA's construction of the FMCSRs and their preemptive effect warrants substantial deference. The FHWA's construction is consistent with the enabling statutes involved, as well as the objectives and language of the regulatory scheme itself. Such deference is further warranted in light of the relevant case law. For example, in *French v. Pan Am Express, Inc.*, 869 F.2d 1 (1st Cir.1989), the First Circuit was confronted with a Rhode Island statute similar to the Act. The Rhode Island statute prohibits employee drug testing except when the "employer has reasonable grounds to believe, based on specific objective facts, that the employee's use of controlled substances is impairing his ability to perform his job...." R.I. Gen. Laws § 28–6.5–1(A). The statute requires the employer to provide a "bona fide rehabilitation program" for employees who test positive. § 28–6.5–1(C). Civil and criminal penalties may be assessed against employers who violate the Rhode Island statute. § 28–6.5–1(F).

Congress and the Department of Transportation have enacted a regulatory regime with regard to air safety and pilot qualifications comparable to that established by the FMCSRs. A pilot must possess an "airman's certificate" in order to operate an aircraft. 49 U.S.C.App. § 1430(a)(2). A certificate is issued only if a pilot is determined to be qualified. 49 U.S.C.App. § 1422(b)(1). As part of this process, a pilot must be medically certified. 14 C.F.R. § 61.3(c). All classes of medical certificates require that the pilot not have a history of drug dependence (i.e., the habitual use of, or addiction to, drugs). 14 C.F.R. §§ 67.13(d)(1)(d), 67.15(d)(1)(d), 67.-17(d)(1)(d).

In *French*, Pan Am was informed by the Warwick, Rhode Island, police department that French may have used marijuana

---

**4.** *See* Letter from Anthony J. McMahon, Chief Counsel of the FHWA (Oct. 28, 1988) (Exhibit A, Plaintiff's Memorandum of Law on Cross Mo- tions for Summary Judgment) (hereinafter cited as "Letter").

**50**

while off duty. Pan Am responded by insisting that French submit to a urine drug screen. He claimed that this violated R.I. Gen. Laws § 28–6.5–1 since Pan Am neither had reasonable grounds to believe he was using drugs in a way that impaired his job performance, nor offered a bona fide rehabilitation program. The First Circuit held that the Rhode Island statute was preempted by federal regulations regarding air safety and pilot qualification.

The court noted that Congress' delegation of power to the Department of Transportation regarding the establishment of air safety standards "is as deep as it is wide." 869 F.2d at 3. The court went on to state:

> The intricate web of statutory provisions affords no room for the imposition of state-law criteria vis-à-vis pilot suitability. We therefore conclude, without serious question, that preemption is implied by the comprehensive legal scheme which imposes on the Secretary of Transportation the duty of qualifying pilots for air service.

*Id.* at 4.

■ Comprehensiveness alone does not support a finding of preemption. *See Environmental Encapsulating Corp. v. City of New York*, 855 F.2d 48, 58 (2d Cir.1988). However, as in *French,* when a broad statutory delegation of power and the resulting regulatory scheme evince an intent to establish uniform, minimum federal standards for qualification, preemptive intent should be implied. *French,* 869 F.2d at 4. The First Circuit observed: "It is hard to imagine an area of regulation that is more closely related to air safety than pilot qualification. And local restrictions on pilot qualification would make impossible the attainment of the centralized control and uniformity of design so plainly coveted by Congress." *Id.* at 5.

The First Circuit also rejected the argument that since it was possible to act in accordance with both the Rhode Island statute and the federal regulations, preemption should not be implied. The court stated: "So long as occupation of an envisioned field was intended, 'any state law

falling within th[e] field is pre-empted.'" *Id.* at 6 (quoting *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984)). This holds true "regardless of the state's legitimate purpose." *Environmental Encapsulating,* 855 F.2d at 59.

■ We are mindful that the First Circuit's holding in *French* was based upon its finding that federal regulations concerning pilot qualification evinced a congressional intent to occupy the field completely. Nonetheless, we believe that the First Circuit's reasoning applies with equal force when, as in the instant case, the state law in question would stand as an obstacle to the accomplishment and execution of the full purposes of federal regulations concerning driver qualification and a motor carrier's concomitant duties.

In the case at bar, Defendant further contends that the Act is directed toward the health and safety of Vermont residents and, therefore, falls within the ambit of Vermont's police powers. The Supreme Court has agreed that "the presumption that state or local regulation of matters related to health and safety is not invalidated under the Supremacy Clause." *Hillsborough,* 471 U.S. at 715, 105 S.Ct. at 2376. This is because "the regulation of health and safety matters is primarily, and historically, a matter of local concern." *Id.* at 719, 105 S.Ct. at 2378. *See also Environmental Encapsulating,* 855 F.2d at 57–58.

Examination of the legislative history behind the Act, however, belies Defendant's proffered health and safety purposes he claims underlie the Act. Vermont Senator Seth Bongartz was the reporter of H.39, the bill that gave rise to the Act. In his testimony before the Senate Judiciary Committee, Senator Bongartz made it quite clear that the *privacy rights* of employees, as opposed to health and safety concerns, were the primary impetus behind the Act. *See* Hearing on H.39, Senate Judiciary Committee (Apr. 23, 1987) (Exhibit F, Plaintiff's Reply Memorandum on Cross Motions for Summary Judgment), at 7–10. While the protection of the privacy rights of employees is certainly a laudable reason for

passage of the Act, those rights are not genuinely related to the "health and safety" of employees, notwithstanding Defendant's proffered *post hoc* assertions. As the First Circuit recognized: "[T]he state statute must yield to the force of federal law in the present context, notwithstanding that it is constructed upon values familiar to many and cherished by most, and notwithstanding that it may fit neatly within or alongside the federal scheme." *French,* 869 F.2d at 6.

The realm of motor carrier safety and the qualification of drivers is properly governed by the FMCSRs pursuant to congressional delegation of that authority. The FMCSRs clearly permit and encourage additional, relevant diagnostic tests such as urine drug screens in order to ascertain whether an employee is physically qualified to drive a commercial motor vehicle. Since the Act would operate to constrain a motor carrier's ability to satisfy its affirmative duty to ensure drivers are physically qualified to drive, it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of the FMCSRs. Therefore, we find that the FMCSRs do preempt the Act as Defendant would have it apply against Yellow Freight.

## CONCLUSION

In light of the foregoing, Yellow Freight's motion for summary judgment is granted and Defendant's motion for summary judgment is denied. Accordingly, Defendant is enjoined from enforcing the provisions of the Act against Yellow Freight. Since we find that the FMCSRs preempt operation of the Act as enforced against Yellow Freight, we need not conclusively resolve the other claims advanced by Yellow Freight.[5]

---

**5.** While we are not required to address Yellow Freight's contention that the Act violates the Commerce Clause, and is preempted by the LMRA, the NLRA, and ERISA, we have examined the discussion of these issues in the parties' legal memoranda and have conducted additional research of our own. In all probability, if it had been necessary for the just and efficient resolution of the case at bar, we would have concurred with Yellow Freight's arguments on these issues as well.