Gorton v. Callahan, SSA          CV-96-609-JD  01/20/98
              UNITED STATES DISTRICT COURT FOR THE
                    DISTRICT OF NEW HAMPSHIRE


Daniel G. Gorton, Sr.

     v.                          Civil No. 96-609-JD

John J. Callahan, Acting
Commissioner, Social Security
Administration


                         O R D E R


     The plaintiff, Daniel G. Gorton, Sr., brings this action

pursuant to section 205(g) of the Social Security Act, 42 U.S.C.

§ 405(g), seeking review of a final decision of the defendant,

the Commissioner of the Social Security Administration

("Commissioner"), denying his claim for benefits under the Act.

Before the court are the plaintiff's motion for an order

reversing the Commissioner's decision (document no. 4) and the

defendant's motion for an order affirming the Commissioner's

decision (document no. 8).


                        Background

     Pursuant to Local Rule 9.1, the parties have filed the

following joint statement of material facts, which the court

incorporates verbatim:

## Introduction

Plaintiff filed an application for disability benefits on January 31, 1994, alleging an inability to work due to a back condition (Tr. 103). Plaintiff has a seventh grade education[1] (Tr. 107), and past work experience as a tractor-trailer driver, a carpenter, and a janitor (Tr. 107).

## Medical Evidence

The record shows that the plaintiff apparently suffered two injuries to his back during the month of September 1991, while he was working (Tr. 127). The first of these injuries occurred on September 9, 1991, at which time a load of pallets fell on the plaintiff; the second accident, which occurred on September 24, 1991, involved a motor vehicle accident.

The earliest evidence of treatment for the plaintiff's back injuries was an examination performed by Dr. Charles P. Earley on October 14, 1991 (Tr. 127-129). Dr. Earley found that the plaintiff could straight leg raise to 45 degrees, and had normal sensation (Tr. 128). However, the plaintiff's reflexes were sluggish and he could not toe or heel walk. Additionally, the plaintiff had tenderness, muscle spasm and loss of curvature in his cervical and lumbar spine (Tr. 128). A CT scan of the plaintiff's cervical spine was normal, and x-rays of the plaintiff's lumbosacral spine revealed only mild degenerative arthritis (Tr. 130, 134). Dr. Earley diagnosed the plaintiff with a severe strain of the cervical spine, a severe strain of the lumbar spine, a possible closed

---

[1] While the body of the ALJ's decision refers to the plaintiff's tenth grade education (Tr. 24), the defendant would submit that this is harmless error as the ALJ's findings clearly state that the plaintiff has a seventh grade education (Tr. 25). Moreover, even if the ALJ did assume that the plaintiff had a tenth grade education, this would in no way affect the ALJ's determination under the Medical Vocational Guidelines, as both seventh and tenth grade educations fall under the same category of "limited". See 20 C.F.R. § 404.1564 (b)(3).

2

head injury, an acceleration-deceleration injury, and traumatic anxiety syndrome. He issued the plaintiff a certificate stating that the plaintiff had "a total disability" (Tr. 129).

At a follow-up visit with Dr. Earley in October 1991, the plaintiff was found to be experiencing impaired memory and difficulty concentrating, in addition to low back, groin, and hip pain (Tr. 131). Repeat cervical CT scan and lumbosacral X-rays were both normal (Tr. 136).

Dr. Kenneth J. Morrissey, an orthopedic surgeon, evaluated the plaintiff on November 1, 1991 (Tr. 137-138). Upon physical examination, Dr. Morrissey found loss of the lumbar lordosis[2], spasm and limitation of motion (Tr. 137). Straight leg raising was positive at 30 degrees on the right and 70 degrees on the left. The plaintiff's reflexes and sensation were both normal (Tr. 137). Dr. Morrissey diagnosed headaches; a cervical strain, rule out disc rupture; and a lumbosacral strain (Tr. 138). He stated that he would keep the plaintiff out of work and would recommend physical therapy.

A CT scan of the plaintiff's orbits, performed on November 2, 1991, at the request of Dr. Morrissey, showed no abnormality (Tr. 154). Additionally, an MRI of the plaintiff's lumbosacral spine, performed the same day, revealed some disc desiccation[3] at L3-4, L4-5, and L5-S1, asymmetric protrusion at L4-5, and very mild asymmetric protrusion at L5-S1 (Tr. 155).

Plaintiff continued to be followed by Dr. Earley in November and December 1991 (Tr. 131). The record does not contain any physical findings from these visits, although Dr. Earley continued to find that it was "inadvisable for the [plaintiff] to return to

---

[2]The anterior concavity in the curvature of the lumbar and cervical spine as viewed from the side. Dorland's Illustrated Medical Dictionary (Dorland's), 28th ed., at p. 960.

[3]The act of drying up. Id. at p. 451.

3

work".

At a follow-up visit in December 1991, Dr. Morrissey noted little change in either the plaintiff's complaints or physical findings and suggested a neurological evaluation (Tr. 139). Further follow-up visits with Dr. Earley also noted the same complaints, and found that the plaintiff was still not advised to return to work (Tr. 131-132).

In February and March 1992, with little change in the plaintiff's complaints or findings, Dr. Morrissey began suggesting further diagnostic testing for the plaintiff's back, including electromyography[4] (EMG) (Tr. 140-144). However, the plaintiff refused to undergo any testing which involved needles.

Dr. Syed M. Sayeed, a neurologist, examined the plaintiff, on March 26, 1992 (Tr. 156). Dr. Sayeed found that the plaintiff was cooperative, with normal intelligence and speech, and no motor or sensory deficits. He diagnosed the plaintiff with post traumatic headache, rule out intracranial pathology; and traumatic neck injury, improved (Tr. 156). Dr. Sayeed suggested a CT scan of the plaintiff's head without contrast. This was performed on April 1, 1992, and was normal (Tr. 157).

Further follow-up examinations by Dr. Morrissey in April through July 1992 noted essentially the same complaints and findings (Tr. 145-149). Dr. Morrissey suggested another MRI, as well as continued therapy and neurological evaluation. During this time, Dr. Morrissey also continued to find that the plaintiff was disabled, a least from his usual job (Tr. 145-149).

In July 1992, the plaintiff underwent nerve

---

[4]An electrodiagnostic technique for recording the extracellular activity of skeletal muscles at rest, during voluntary contractions, and during electrical stimulation; performed using any variety of surface electrodes, needle electrodes, and devices for amplifying, transmitting, and recording the signals. Id. at p. 537.

conduction studies, which found no evidence of neuropathy[5] (Tr. 158). He again refused EMG examination. At an exam with Dr. Morrissey that same month, the plaintiff stated that his back was "feeling pretty good" as he had not been doing much lifting (Tr. 150). Physical exam showed that the plaintiff's lumbar spine was quite flexible with no spasm. Plaintiff's cervical spine still showed some tenderness and limitation of motion; however the plaintiff's reflexes were intact (Tr. 150). Dr. Morrissey stated that the plaintiff was fully disabled in relation to Plaintiff's past work as a tractor trailer driver, and partially disabled otherwise.

Additionally, following another exam in September 1992, Dr. Morrissey stated that he thought the plaintiff could not perform his past work, but would be capable of a lighter type of work with no lifting of more than 20 pounds (Tr. 151). This opinion was repeated at another follow-up exam in October 1992, at which time Dr. Morrissey also stated that the plaintiff's loss of use rating from this impairment was 5% (Tr. 152).

The plaintiff apparently began working as a janitor near the end of 1992 (Tr. 47-48). In February 1993, he was seen at the Littleton Regional Hospital emergency room complaining of back pain he experienced while working (Tr. 160-164). X-rays of the plaintiff's lumbar spine, taken at this time, found no evidence of recent injury or significant abnormality (Tr. 163). Plaintiff was prescribed bedrest and medication (Tr. 160). He was also given a work release form for an "undetermined" amount of time (Tr. 164).

On February 22, 1993, the plaintiff was seen at Littleton Orthopaedics, where he was found to have a stable, but antalgic[6] gait, decreased straight leg

---

[5]A functional disturbance or pathological change in the peripheral nervous system. Id. at p. 1132.

[6]Counteracting or avoiding pain, as a posture or gait assumed so as to lessen pain. Dorland's at p. 90.

5

raising, and decreased sensation (Tr. 165). Plaintiff's reflexes were normal. Doctors felt that the plaintiff had a herniated nucleus pulposus[7] (HNP) and recommended strict bedrest and medication (Tr. 165). Within a week, the plaintiff described his back as "much better".

Dr. Davis W. Clark, an orthopaedic surgeon, examined the plaintiff on March 4, 1993 (Tr. 166-168). At this time, Dr. Clark found that the plaintiff walked with a minimal antalgic gait, had some tenderness, and had significant limitation of motion (Tr. 167). The plaintiff also had normal reflexes and sensation and no gross motor loss. Dr. Clark thought that the plaintiff most likely had a herniated disc at the L4-5 level (Tr. 167). He suggested physical therapy and medication. Dr. Clark also noted that the plaintiff was capable of returning to work on a part-time basis without any significant bending or lifting (Tr. 167).

Plaintiff did return to work, but reportedly experienced more pain in doing so (Tr. 169). Dr. Clark suggested that this maybe should be handled surgically, and requested another MRI. This MRI, taken on March 25, 1993, found no evidence of disc herniation or spinal stenosis[8] (Tr. 170).

Also on March 25, 1993, Dr. Ronald J. Faille, a neurosurgeon, examined the plaintiff (Tr. 176-177). Dr. Faille found that the plaintiff's cranial nerves were normal, and that he had no evidence of muscle atrophy or fasciculations[9] (Tr. 177). Plaintiff's

---

[7]Rupture or prolapse of the pulpy nucleus of intervertebral disk. Id. at pp. 759, 1159.

[8]Narrowing of the vertebral canal, nerve root canals, or intervertebral foramina of the lumbar spine caused by encroachment of bone upon the space; symptoms are caused by compression of the cauda equina and include pain, paresthesias, and neurogenic claudication. Id. at p. 1576.

[9]A small local contraction of muscles, visible through the skin, representing a spontaneous discharge of a number of fibers innervated by a single motor nerve filament. Id. at p. 610.

6

sensation and reflexes were normal and he could walk both heel and toe very well.  The plaintiff did have muscle spasm and limitation of motion, but both his Lasegue[10] and Patrick's[11] tests were negative (Tr. 177).  Dr. Faille diagnosed a lumbar strain.

Plaintiff returned to Dr. Clark in April 1993, at which time he diagnosed recurrent lumbar strain with radiculopathy[12] and suggested that the plaintiff begin trying some physical therapy (Tr. 171).  This therapy apparently began later that month (See Tr. 185-186).  Subsequent correspondence from Dr. Clark shows that he believed that the plaintiff was disabled in April 1993 (Tr. 172).

Dr. David J. Nagel, an orthopaedist, examined the plaintiff in June 1993, finding limitation of motion, and tenderness, but no atrophy, normal muscle strength and normal reflexes (Tr. 187-188).  Dr. Nagel diagnosed subacute low back pain with diminished radicular component, and noted that he was concerned about a central disk injury (Tr. 188).  He recommended conservative treatment, including work tolerance and work hardening programs.  Dr. Nagel also noted a "sticky point" was that the plaintiff would take a big pay cut to try to return to work (Tr. 188).

Also in June 1993, the plaintiff underwent an occupational medicine assessment by Dr. John A. Davis (Tr. 203-206).  Based on a physical examination and review of the radiographic evidence, Dr. Davis concluded that the plaintiff did not have any anatomical problems in his lumbar spine as a result of

---

[10]This is a test for sciatica.  <u>Dorland's</u> at p. 1524.

[11]With the patient supine, the thigh and knee are flexed and the external malleolus is placed over the patella of the opposite leg; the knee is depressed, and if pain is produced thereby arthritis of the hip is indicated.  <u>Id</u>. at p. 1681.

[12]Disease of the nerve roots.  <u>Id</u>. at p. 1404.

the February 1993 incident, and had no evidence of neurological deficit to explain his symptoms (Tr. 205). Dr. Davis further concluded that the plaintiff could return to his work as a janitor without any restrictions. He also found that the plaintiff would be able to perform the jobs of bus person and kitchen steward at Loon Mountain (Tr. 207).

Follow-up visits with Dr. Nagel from July through September 1993 showed that the plaintiff's symptoms continued to wax and wane (Tr. 189- 193). During this period, Dr. Nagel issued work release forms for the plaintiff (Tr. 192). On September 24, 1993, Dr. Kenneth D. Polivy performed an evaluation of the plaintiff for the plaintiff's employer's workers compensation carrier (Tr. 181-183). Dr. Polivy noted that the plaintiff was able to heel and toe walk, and had no motor, sensory or reflex deficits (Tr. 182). The plaintiff did however, have decreased range of motion secondary to his complaints of pain. Dr. Polivy concluded that the plaintiff had suffered a lumbosacral sprain in February 1993, but that there was no remaining objective evidence of impairment (Tr. 183). He opined that the plaintiff could resume his past work as a janitor, initially limiting his lifting to 15 to 20 pounds, as well as bending.

Dr. Nagel saw the plaintiff again on November 1, 1993, at which time he noted that the plaintiff's symptoms still continued to wax and wane (Tr. 194, 196). He issued the plaintiff another work release form pending the results of the plaintiff's physical capacity evaluation (Tr. 197).

The physical capacity evaluation was performed on November 18, 1993 (Tr. 214-221). This evaluation found that the plaintiff had a light-medium capacity as he could lift a maximum of 45-50 pounds from 12 inches off the ground (Tr. 220). Doctors noted that the results of this testing, combined with the plaintiff's pre-testing activities, may equate with a full-time capacity.

In December 1993, both Dr. Nagel and the plaintiff worked to find a suitable job for the plaintiff, given his limitations (Tr. 195). Based on the results of the

physical capacity evaluation and the desires of the plaintiff, it was determined that the plaintiff would return to work in January 1994 as a gas station attendant. Dr. Nagel provided a limited work form which stated that the plaintiff was to be restricted to 8 hours per day, lifting 20 pounds occasionally and 10 pounds frequently, and from repetitive stooping and bending (Tr. 173).

Plaintiff apparently experienced pain working at this job and was taken out of work by Dr. Nagel (Tr. 173, 198). Follow-up with Dr. Nagel in January through March 1994 showed that the plaintiff's condition essentially waxed and waned (Tr. 174, 199, 209). In March 1994, Dr. Nagel did opine that the plaintiff was "totally disabled from doing anything meaningful in the work place" (Tr. 174, 209).

At a follow-up visit in May 1994, Dr. Nagel noted that the plaintiff's examination was unchanged, and that the plaintiff no longer had vocational aspirations (Tr. 200). A July 1994 letter from Dr. Nagel to the plaintiff's attorney stated that the plaintiff was at a medical endpoint and had a sedentary work release; Dr. Nagel noted that the only concern was whether the plaintiff had the skills to find a job (Tr. 201).

Lastly, in December 1994, Dr. Nagel completed a medical assessment of the plaintiff's ability to do work-related activities (physical) (Tr. 222-227). Dr. Nagel found that the plaintiff could lift and carry 10-15 pounds, stand or walk for 15 minutes continuously or for 2-3 hours total, and sit for 30 minutes continuously or 2-3 hours total (Tr. 224-227). However, Dr. Nagel additionally stated that the plaintiff was not released for full-time work yet, as he had not yet tolerated 4 hours of sedentary work (Tr. 225, 227).[13]

_____

There was additional evidence submitted by the plaintiff to the Appeals Council (Tr. 230-251). This evidence was not available to the ALJ in making his decision. Nevertheless, the Appeals Council determined that this evidence did not change the weight of evidence of record, thus it would not indicate that the

Medical records submitted by the plaintiff subsequent to the hearing and prior to the decision of the Appeals Council, indicate that the plaintiff continued to treat with Dr. Nagle [sic] throughout the remainder of 1993 [sic], and continued through 1996 (Tr. 230-246). In February 1996, the plaintiff sustained a twisting injury to his left ankle due to reflex give-away, which in the opinion of Dr. Nagle [sic] is common in individuals with back pain (Tr. 233).

## Discussion

Pursuant to 42 U.S.C. § 405(g), the court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." In reviewing a Social Security disability decision, the factual findings of the Commissioner "shall be conclusive if supported by 'substantial evidence.'" Irlanda Ortiz v. Secretary of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (quoting 42 U.S.C. § 405(g)).[14] The court "'must uphold the

_____

plaintiff was disabled (Tr. 4-5).

[14]Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (citing Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). "This is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966); Benko v. Schweiker, 551 F. Supp. 698, 701 (D.N.H. 1982).

10

[Commissioner's] findings . . . if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion.'" Id. (quoting Rodriguez v. Secretary of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)); accord Richardson v. Perales, 402 U.S. 389, 401 (1971). The record must be viewed as a whole to determine whether the decision is supported by substantial evidence. See Frustaglia v. Secretary of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); Rodriguez, 647 F.2d at 222. Moreover, "[i]t is the responsibility of the [Commissioner] to determine issues of credibility and to draw inferences from the record evidence. Indeed, the resolution of conflicts in the evidence is for the [Commissioner], not the courts." Irlanda Ortiz, 955 F.2d at 769 (citing Rodriguez, 647 F.2d at 222); see also Burgos Lopez v. Secretary of Health & Human Servs., 747 F.2d 37, 40 (1st Cir. 1984).

The administrative law judge ("ALJ") is required to consider the opinions of a claimant's treating physician as to the claimant's impairments. See 20 C.F.R. § 404.1527(d)(2) (1997). The relevant regulations provide as follows:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the

11

> objective medical findings alone or from reports of
> individual examinations, such as consultative
> examinations or brief hospitalizations.  If we find
> that a treating source's opinion on the issue(s) of the
> nature and severity of your impairment(s) is well-
> supported by medically acceptable clinical and
> laboratory diagnostic techniques and is not
> inconsistent with the other substantial evidence in
> your case record, we will give it controlling weight.
> When we do not give the treating source's opinion
> controlling weight, we apply the factors listed below,
> as well as the factors in paragraphs (d)(3) through (5)
> of this section in determining the weight to give the
> opinion.  We will always give good reasons in our
> notice of determination or decision for the weight we
> give your treating source's opinion.

Id. § 404.1527(d)(2).  The factors considered in determining the weight to give a treating physician's opinion when it is not entitled to controlling weight include the following:  the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the extent to which the opinion has been supported and is supportable, the consistency of the opinion with the record as a whole, and the specialization of the opining physician.  See id. §§ 404.1527(d)(2)(i), (2)(ii), (3), (4), (5).  The ALJ is not required, however, to accept a treating physician's opinion that a claimant is "disabled" or "unable to work."  See id. § 404.1527(e)(1).

The ALJ is required to consider the subjective complaints of pain or other symptoms made by a claimant who presents a "clinically determinable medical impairment that can reasonably

be expected to produce the pain alleged." <u>Avery v. Secretary of Health & Human Servs.</u>, 797 F.2d 19, 21 (1st Cir. 1986); <u>accord</u> 42 U.S.C.A. § 423(d)(5)(A) (West Supp. 1997); 20 C.F.R. § 404.1529 (1997). "[C]omplaints of pain need not be precisely corroborated by objective findings, but they must be consistent with medical findings." <u>Dupuis v. Secretary of Health & Human Servs.</u>, 869 F.2d 622, 623 (1st Cir. 1989); <u>see</u> <u>Bianchi v. Secretary of Health & Human Servs.</u>, 764 F.2d 44, 45 (1st Cir. 1985) ("The [Commissioner] is not required to take the claimant's assertions of pain at face value.") (quoting <u>Burgos Lopez</u>, 747 F.2d at 40). Once a medically determinable impairment is documented, the effects of pain must be considered at each step of the sequential evaluation process. <u>See</u> 20 C.F.R. § 404.1529(d) (1997). A claimant's medical history and objective medical evidence are considered reliable indicators from which the ALJ may draw reasonable conclusions regarding the intensity and persistence of the claimant's pain. <u>See</u> <u>Avery</u>, 797 F.2d at 23; 20 C.F.R. § 404.1529(c)(3) (1997). However, situations exist in which the reported symptoms of pain suggest greater functional restrictions than can be demonstrated by the medical evidence alone. <u>See</u> <u>id.</u>

When a claimant complains that pain or other subjective symptoms are a significant factor limiting his ability to work and those complaints are not fully supported by medical evidence

contained in the record, the ALJ must undertake further exploration of other information.  See Avery, 797 F.2d at 23. The ALJ must consider the claimants's prior work record; daily activities; location, duration, frequency and intensity of pain; precipitating and aggravating factors; type, dosage, effectiveness and side effects of any medication taken to alleviate pain or other symptoms, past or present; treatment, other than medication, received for relief of pain or other symptoms, past or present; any measures used, past or present, to relieve pain or other symptoms; and other factors concerning functional limitations and restrictions due to pain.  See 20 C.F.R. § 404.1529(c)(3) (1997); Avery, 797 F.2d at 23; S.S.R. 88-13.  Moreover, when assessing credibility the ALJ may draw an inference that the claimant would have sought additional treatment if the pain were as intense as alleged.  See Irlanda Ortiz, 955 F.2d at 769.  If the complaints of pain are found to be credible under the criteria, the pain will be determined to diminish the claimant's capacity to work.  See 42 U.S.C.A. § 423(d) (West Supp. 1997); 20 C.F.R. § 404.1529(c)(4) (1997). Finally, the court gives deference to credibility determinations made by the ALJ, particularly where the determinations are supported by specific findings.  See Frustaglia, 829 F.2d at 195 (citing DaRosa v. Secretary of Health & Human Servs., 803 F.2d

14

24, 26 (1st Cir. 1985)).

In this case, the ALJ denied the plaintiff's claim for benefits after finding that the plaintiff, although unable to perform his past work as a tractor-trailer operator, janitor, and carpenter, maintained a residual functional capacity to perform a full range of light work, and that, together with his age, this indicated that he was not disabled. The plaintiff urges that the ALJ failed to give appropriate weight to the opinion of Dr. Nagel, the plaintiff's treating physician, that the plaintiff was totally disabled. He also contends that the ALJ improperly discounted the plaintiff's subjective reports of pain and disabling physical limitations. The court considers these arguments <u>seriatim</u>.

I.    <u>ALJ's Consideration of the Opinions of the Plaintiff's</u>
      <u>Treating Physician</u>

Dr. Nagel initially cleared the plaintiff for full-time light work with only a restriction on lifting. He revised his assessment to conclude that the plaintiff was capable only of part-time sedentary work not on the basis of additional objective medical information, but instead on the plaintiff's subjective report that he could not tolerate even four hours of work when he

15

attempted to return.[15] The ALJ concluded that Nagel's "determination runs counter both to the overwhelming medical evidence in the record, and also to his own functional capacity evaluation and treatment record." (Tr. at 21). The plaintiff urges that the ALJ erred by failing to give proper weight to the opinion of his treating physician, Dr. Nagel, and improperly discounted Dr. Nagel's opinion because the ALJ felt that it was not supported by substantial medical evidence.

The portion Dr. Nagel's opinion concerning the plaintiff's exertional capacity was not entitled to controlling weight under 20 C.F.R. § 404.1527(d)(2) because it was not sufficiently supported by objective medical evidence and not sufficiently consistent with the other evidence in the record. Dr. Nagel's initial opinion based on objective medical evidence was that the plaintiff was capable of performing light work; the revision of his opinion was based not on additional "clinical [or] laboratory diagnostic techniques," id. § 404.1527(d)(2), but upon the plaintiff's reports of disabling pain. As the plaintiff acknowledges, other physicians opined that he had no significant limitations based on his objective medical condition. This

_____

[15]Because in the statutory framework either full- or part-time work can be "substantial gainful activity," a claimant can be found not to be disabled even if capable only of part-time work. See 20 C.F.R. § 404.1572 (1997).

16

provided an adequate basis for the ALJ to give Dr. Nagel's opinion less than controlling weight. See id. The ALJ also disagreed with Dr. Nagel's legal conclusion that the plaintiff is "disabled." However, the ALJ was not required to give any deference to this portion of Dr. Nagel's opinion. See 20 C.F.R. § 404.1527(e)(1).

Moreover, the ALJ neither disregarded Dr. Nagel's opinions entirely nor reached a result any less favorable to the plaintiff than he would have if he had adopted Dr. Nagel's opinion that the plaintiff was capable only of sedentary work. At step two of the sequential evaluation process, the ALJ credited Dr. Nagel's assessment that the plaintiff had restrictions on his physical activities and found that the plaintiff had a severe impairment.[16] At step four, the ALJ determined that, even though the plaintiff was not capable of performing his past relevant work, the plaintiff maintained the residual functional capacity to perform a full range of light work. At step five, the ALJ consulted the Medical-Vocational guidelines ("the grid"). See id. Pt. 404, Subpt. P, App. 2. Given the plaintiff's age and limited education, the ALJ properly found that the plaintiff was

_____

[16]At step three, the ALJ determined that the plaintiff's disability did not meet or equal any listed impairment. The plaintiff has not challenged this finding.

17

not disabled.  See id., Rule 202.18 (non-transferable skills);
Rule 202.19 (transferable skills).  Significantly, the grid would
have indicated the same conclusion had the ALJ classified the
plaintiff with the residual functional capacity for only
sedentary work as Dr. Nagel's ultimate opinion suggested.  See
id., Rule 201.25 (non-transferable skills); Rule 201.26
(transferable skills).

Therefore, the ALJ's treatment of Dr. Nagel's opinion was
proper.  Although the ALJ failed to give it controlling weight,
he was not required to do so.  He considered Dr. Nagel's opinion
and reached a conclusion no less favorable to the plaintiff than
he would have reached had he adopted Dr. Nagel's medical opinion
in its entirety.  The plaintiff has not shown that the ALJ's
decision need be reversed on this basis.


II.  ALJ's Evaluation of Plaintiff's Subjective Complaints of
     Pain

The plaintiff asserts that the ALJ failed to consider
properly the limitations on the plaintiff caused by pain when he
found that the plaintiff was capable of performing work requiring
a light level of exertion.  The plaintiff's claim is belied by
the record.  The record shows that the ALJ considered the
plaintiff's subjective complaints of pain as required, but found
them to be less than fully credible.  See Tr. at 25.  He

18

questioned the plaintiff, as required by <u>Avery</u>, about the following factors:  prior work record, <u>see, e.g.</u>, Tr. at 47-49; daily activities, <u>see, e.g.</u>, Tr. 54-55; location, duration, frequency and intensity of pain, <u>see, e.g.</u>, Tr. at 58-59; precipitating and aggravating factors, <u>see, e.g.</u>, Tr. at 50, 56; type, dosage, effectiveness and side effects of medication, <u>see, e.g.</u>, Tr. at 50-52; treatment other than medication, <u>see, e.g.</u>, Tr. at 59; and, measures used to relieve pain or other symptoms, <u>see, e.g.</u>, Tr. at 57, 58-59.

After having an opportunity to assess the plaintiff's demeanor and weigh the medical evidence, the ALJ concluded that his subjective complaints of pain were not credible.  <u>See</u> Tr. at 25.  The ALJ found that the plaintiff did suffer from pain, but the pain was not severe enough to disable him completely.  <u>See</u> Tr. at 23.  Such credibility determinations are the purview of the ALJ.  <u>See</u> <u>Irlanda Ortiz</u>, 955 F.2d at 769.  The ALJ's conclusion was supported by substantial evidence, and the fact that he might have reached a different conclusion based on the evidence in the record is not grounds for reversal.  <u>See, e.g.</u>, <u>id.</u>

## Conclusion

The plaintiff's motion for an order reversing or remanding

19

the Commissioner's decision (document no. 4) is denied.  The

defendant's motion for an order affirming the Commissioner's

decision (document no. 8) is granted.  The clerk is ordered to

close the case.

SO ORDERED.


_____
Joseph A. DiClerico, Jr.
District Judge

January 20, 1998

cc:   Stanley H. Robinson, Esquire
      David L. Broderick, Esquire