Jamie E. SOMES, as executrix
of the estate of Steven P.
Somes Plaintiff,

v.

UNITED AIRLINES, INC. Defendants.

No. 98–CV–10183—MEL.

United States District Court,
D. Massachusetts.

Jan. 11, 1999.

John C. Sikorski, Ronald C. Kidd, Robinson, Donovan, Madden & Barry, Paul S. Weinberg, Robinson, Donovan, Madden & Barry, Springfield, MA, for Plaintiff.

Peter J. Black, Meehan, Boyle & Cohen, P.C., Boston, MA, for Defendants.

## MEMORANDUM AND DECISION

LASKER, District Judge.

Jamie Somes commenced this suit against United Airlines under the Massachusetts wrongful death statute, Mass. Gen. Laws, ch. 229, § 2. On October 18, 1995, her husband, Steven Somes, suffered a cardiac arrest and died while traveling from Boston to San Francisco aboard United Airlines Flight 37. Mrs. Somes alleges that United is liable because it failed to equip its aircraft with certain medical equipment, including an automatic external defibrillator, and because her husband would have survived if the in-flight emergency medical kit had contained such equipment. (Pl.'s Compl. at ¶ 15.) United moves to dismiss the Complaint pursuant to Fed.R.Civ.P. 12(b)(6) on the grounds that the plaintiff's claim is preempted by federal law. The motion is denied.

### I. *Preemption Principles*

■ The question whether a state law claim is preempted by a federal statute is a matter of congressional intent. *French v. Pan Am Express, Inc.*, 869 F.2d 1, 2 (1st Cir.1989) (citing *California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 280, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987)). Congressional intent to preempt state law can be found in the explicit language of a statute, implied from the existence of a comprehensive regulatory scheme, *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947), or inferred when the state law in question directly conflicts with a federal law or stands as an obstacle to achievement of federal objectives. *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 248, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984) (citations omitted).

■ A cardinal rule of preemption analysis is the "starting presumption that Congress d[id] not intend to supplant state law." *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995). This "presumption against preemp-tion" takes on added significance "where federal law is said to bar state action in fields of traditional state regulation." *Id.* at 655, 115 S.Ct. 1671. Accordingly, "the historic police powers of the States [a]re not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress." *Id.* (quoting *Rice*, 331 U.S. at 230, 67 S.Ct. 1146).

### II. *The Civil Aeronautics Act, the Federal Aviation Act, and the Airline Deregulation Act*

■ The federal statutes relevant to the question of whether Somes' action is preempted are: the Civil Aeronautics Act of 1938, the Federal Aviation Act of 1958, and the Airline Deregulation Act of 1978. Congress enacted the Civil Aeronautics Act ("CAA") in 1938 for the purpose of "regulat[ing] entry into the interstate airline industry, the routes that airlines could fly, and the fares that they could charge consumers." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 422, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) (Stevens, J., dissenting) (citing Civil Aeronautics Act, § 411, 52 Stat. 987–994). The CAA did not expressly preempt state regulation, and contained a "savings clause," which preserved existing common law and statutory remedies. The CAA's "savings clause" provided:

> Nothing contained in this Act shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this Act are in addition to such remedies.

Civil Aeronautics Act, § 1106, 52 Stat. 1027 (1938) (current version at 49 U.S.C. § 40120(c) (1998)).

The Federal Aviation Act was passed by Congress in 1958, Pub.L. No. 85–726, 72 Stat. 731. The statute largely replaced the CAA, but kept intact the principal provisions of the CAA, including the savings clause. This statutory scheme remained in place until 1978, when Congress deregulated domestic air travel.

■ In 1978, Congress determined that " 'maximum reliance on competitive market forces' would best further 'efficiency, innova-

tion, and low prices,' as well as 'variety [and] quality ... of air transportation' " and enacted the Airline Deregulation Act ("ADA"), Pub.L. No., 92 Stat. 1705. *Morales,* 504 U.S. at 378, 112 S.Ct. 2031 (citing former 49 U.S.C. §§ 1302(a)(4), 1302(a)(9)). The ADA contains a preemption provision, which, as amended, provides:

> [A] State ... may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier.

49 U.S.C. § 41713(b)(1) (1998).[1] This explicit preemption provision was included in the ADA "[t]o ensure that the States would not undo federal deregulation with regulation of their own." *Morales,* 504 U.S. at 378, 112 S.Ct. 2031. Congress, however, left in place the "savings clause." *See* U.S.C. § 40120(c) (1998) ("A remedy under this part is in addition to any other remedies provided by law.").

The scope of the ADA's express preemption clause "has been a source of considerable dispute since its enactment." *Charas v. Trans World Airlines, Inc.,* 160 F.3d 1259, 1263 (9th Cir.1998). Before Congress enacted the ADA, it was understood that the "savings clause" preserved state law personal injury actions. *See Nader v. Allegheny Airlines, Inc.,* 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976) (holding state tort action for fraudulent misrepresentation could "coexist" with the Federal Aviation Act as contemplated by the savings clause). However, since the ADA's enactment, the courts have divided over the interrelationship between the ADA's preemption clause and Congress' retention of the "savings clause" with respect to state tort claims.

### III. *Supreme Court Precedent*

The Supreme Court has interpreted the reach of the ADA's express preemption

clause on two occasions, but has not directly addressed whether state tort actions are within the provision's preemptive scope. The Court first construed the provision in *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). In that case, several states sought to enforce airline fare advertising guidelines adopted by the National Association of Attorneys General ("NAAG") through their existing general consumer protection laws. *Morales,* 504 U.S. at 380–81, 112 S.Ct. 2031. Recognizing that the ADA's preemption provision and the preemption clause in the Employee Retirement Security Act of 1974 ("ERISA") contained the "identical" preemptive language ("relate to"), the Court drew upon its ERISA decisions to hold that "[s]tate enforcement actions having a connection with or reference to airline 'rates, routes, or services' " were preempted by the ADA. *Id.* at 384, 112 S.Ct. 2031 (citing *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 97, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983)). Applying this expansive interpretation of the phrase "relate to," the Court then found that because the "obligations imposed by the [NAAG] guidelines would have a significant impact upon the airlines' ability to market their product, and hence a significant impact upon the fares they charge," they had a "forbidden significant effect" on airline "rates, routes, or services" and were therefore preempted. *Id.* at 390, 112 S.Ct. 2031. However, the Court nevertheless acknowledged that " '[s]ome state actions may affect [airline rates, routes, or services] in too tenuous, remote, or peripheral a manner' to have preemptive effect." *Id.* (citing *Shaw,* 463 U.S. at 100 n. 21, 103 S.Ct. 2890).

Because the Court has used ERISA caselaw as a yardstick for construing the phrase "relate to," it is worth noting that it has

---

1. The Federal Aviation Administration Authorization Act of 1994 ("FAAA"), Pub.L. No. 103–305, 108 Stat. 1569 (1994), recodified and amended the Airline Deregulation Act's preemption clause. The original preemption provision provided:

> No state, ... shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law relating to rates, routes, or services of any air carrier. Airline Deregulation Act, Pub.L. No. 95–504, § 105(a), 92 Stat. 1705 (1978)(formerly codified

at 49 U.S.C. § 1305(a)(1)). While the current version substitutes the word, "price" for "rates," the revisions were not meant to be substantive, *see American Airlines, Inc. v. Wolens,* 513 U.S. 219, 223 n. 1, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995). Accordingly, this opinion uses those terms interchangeably and relies equally upon cases construing both the pre- and post-FAAA versions of the provision.

recently narrowed ERISA's preemptive reach. In *Travelers,* the Court commented, as to ERISA, that "[i]f 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes preemption would never run its course, for '[r]eally, universally, relations stop nowhere.'" 514 U.S. at 655, 115 S.Ct. 1671 (citations omitted). The Court has since directed courts to "look ... to the objectives of the ... statute as a guide to the scope of the state law that Congress understood would survive," rather than apply the preemption standard with "uncritical literalism." *Calif. Div. of Labor Standards Enforcement v. Dillingham Construction N.A., Inc.,* 519 U.S. 316, 325, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997) (quoting *Travelers,* 514 U.S. at 656, 115 S.Ct. 1671).

The Court recognized more specific limits to the ADA's preemptive reach when it revisited the provision in *American Airlines, Inc. v. Wolens,* 513 U.S. 219, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995). *Wolens* involved state law claims arising from an airline's retroactive changes to its frequent flyer program. 513 U.S. at 224–25, 115 S.Ct. 817. Participants in the program sued the airline alleging violations of a state consumer fraud statute and breach of contract. *Id.* The Court again looked to the plain language of the preemption clause, this time focusing on the words, "enact" and "enforce." *Id.* at 227, 115 S.Ct. 817. It held that the consumer fraud claims were preempted because, similar to the NAAG guidelines at issue in *Morales,* the state statute "serve[d] as a means to guide and police the marketing practices of the airlines," thereby imposing state substantive standards with respect to "rates, routes, or services." *Id.* at 228, 115 S.Ct. 817. However, it ruled that the common law-based contract claims were not preempted because they merely involved the enforcement of the airline's "own self-imposed undertakings," and "d[id] not amount to a State's 'enact[ment] or enforce[ment] [of] any law rule, regulation, standard or other provision having the force and effect of law' within the meaning of [§ ] 1305(a)(1)." *Id.* at 228–29, 115 S.Ct. 817.

## IV. *Express Preemption: Section 105(a) of ADA*

■ Relying on what it regards as the expansive sweep of the "relate to" language in the ADA's preemption provision, United contends that Somes' claim is expressly preempted. According to United, any state common law duty requiring airlines to equip planes with specified items of medical equipment would "relate to"—and, indeed, have a significant impact upon—airline "rates" and "services" by increasing fares and prescribing the medical "services" airlines must provide to their passengers.

Somes responds that even if the words "relate to" are to be construed broadly—a proposition which, as indicated above, the Supreme Court has revisited in recent ERISA decisions—her claim is not preempted. She asserts that a crucial factor is the extent to which the ADA limits state regulation of airline "services," as that term is used in the statute. She submits that the ADA and its legislative history demonstrate that a narrow or limited conception of airline "services" is consistent with Congress' objectives in enacting the ADA. According to Somes, because the equipment airlines carry on board flights in case of a medical emergency could not reasonably be found within such a limited conception of "services," Congress could not have intended to preempt her claim.

United counters that Congress' deregulatory purpose in enacting the ADA commands a broader definition of airline "services." It submits that subjecting the airline industry to state tort actions such as Somes' causes patchwork regulation of airline "rates" and "services," which hurts competition and increases the costs of air transportation. According to United, because state tort actions interfere with the fulfillment of Congress' deregulatory efforts, it is inconceivable that Congress intended a narrow definition of "services."

United's argument is unpersuasive. It ignores the presumption against preemption. Somes' claim is a common-law based personal injury action, which concerns health and safety, an area traditionally regulated by the states pursuant to their police powers.

Therefore, United "bear[s] the considerable burden of overcoming 'the starting presumption that Congress did not intend to supplant state law.'" *De Buono v. NYSA–ILA Medical and Clinical Servs. Fund*, 520 U.S. 806, 814, 117 S.Ct. 1747, 138 L.Ed.2d 21 (1997) (quoting *Travelers*, 514 U.S. at 654, 115 S.Ct. 1671). However, United has failed to establish that Congress' "clear and manifest purpose" was to preempt Somes' claim, by use of a broad understanding of the term "services." *Travelers*, 514 U.S. at 655, 115 S.Ct. 1671.

Unfortunately, the ADA does not specify what constitutes an airline "service," and neither the Supreme Court nor the First Circuit has interpreted the term. Nevertheless, several factors suggest that the provision of emergency medical equipment to treat in-flight medical emergencies unrelated to the actual operation of the aircraft is categorically distinct from the "services" Congress had in mind when it adopted the ADA's preemption provision, and accordingly, demonstrate that Congress did not intend by use of the term "services" to preempt Somes claim.

The context in which the term "services" appears in and of itself indicates that the provision of emergency medical equipment is not an airline "service" as Congress understood that term. Indeed, the term's placement adjacent to the words "rates" and "routes" suggests that the congressional purpose was simply to preempt and safeguard the actual transportation service an airline provides to its passengers. As the Ninth Circuit observed in *Charas:*

> "Airlines' "rates" and "routes" generally refer to the point-to-point transport of passengers. "Rates" indicates price; "routes" refers to courses of travel. It therefore follows that "service," when juxtaposed to "rates" and "routes," refers to such things as the frequency and scheduling of transportation, and to the selection of markets to or from which transportation is provided .... To interpret "service" more broadly is to ignore the context of its use; and, it effectively would result in the preemption of virtually everything an airline does."

160 F.3d at 1265–66.

Additional support for the conclusion that Somes' claim is not preempted lies in the fact that the provision of a defibrillator or other equipment for treating in-flight medical emergencies is not encompassed under either the Fifth Circuit or the Ninth Circuit's definition of "services." In *Hodges v. Delta Airlines, Inc.*, the Fifth Circuit endorsed the following definition:

> "Services" generally represent a bargained-for or anticipated provision of labor from one party to another.... Elements of the air carrier service bargain include items such as ticketing, boarding procedures, provision of food and drink, and baggage handling, in addition to the transportation itself.

44 F.3d 334, 336 (5th Cir.1995). Examining the items listed in this definition leads to the conclusion that "services" is restricted to items which are regular, recurrent, or necessary features of actual flight or airline operations. Because the provision of emergency medical equipment is not inherent in the nature of an airline's operations and is typically not a "bargained-for or anticipated" service, it is not an airline "service" under the Fifth Circuit's definition.

The provision of emergency medical equipment falls even more clearly outside the Ninth Circuit's more narrow definition of "services." In *Charas v. Trans World Airlines, Inc.*, the Ninth Circuit, held, en banc, that airline "services" "refer[red] to the prices, schedules, origins, and destinations of the point-to-point transportation of passengers, cargo or mail," but not (as distinct from *Hodges*) to "an airline's provision of in-flight beverages, personal assistance to passengers, the handling of luggage, and similar amenities." *Charas*, 160 F.3d at 1261. This definition limits airline "services" to the transportation of passengers to and from their destinations and the items inherently related to that transportation. Emergency medical equipment is not typically provided in the normal course of transporting passengers to and from their destinations, and accordingly does not fall within the Ninth Circuit's interpretation of airline "services." It follows that neither the Fifth or Ninth Circuit definitions support the contention that Congress, by use of the term "services," intended to

preempt any state law duty relating to in-flight emergency medical kits.

Various other provisions of the ADA and its legislative history reinforce the conclusion that the provision of emergency medical equipment is not an airline "service," as Congress understood that term. Indeed, the language of the ADA and its legislative history make clear that Congress did *not* intend to displace or foreclose all tort actions arising under state law. *Charas,* 160 F.3d at 1265. *See also Smith v. America West Airlines, Inc.,* 44 F.3d 344, 346 (5th Cir.1995) ("Neither the language nor the history of the ADA implies that Congress was attempting to displace state personal injury tort law concerning the safety of the airline business."). In particular, the ADA requires airlines to maintain either insurance or self-insurance, 49 U.S.C. § 41112(a) (1998). Such a requirement would be "pointless," unless Congress expected that some state tort actions would survive the enactment of the ADA. *Charas,* 160 F.3d at 1265; *accord Hodges,* 44 F.3d at 338 ("A complete preemption of state claims for personal injury would have rendered any requirement of insurance coverage nugatory.").

Moreover, Congress' retention of the "savings clause" in the ADA is strong evidence that it did not intend to preempt state personal injury actions. Indeed, in *Wolens,* the Supreme Court, in ruling that state law contract claims survived the enactment of the ADA, remarked that such a conclusion "ma[de] sense of Congress' retention of the FAA's saving clause." 513 U.S. at 232, 115 S.Ct. 817. *See also Charas* 160 F.3d at 1265 ("[T]he savings clause ..., read together with the preemption clause, evidences congressional intent to prohibit states from regulating airlines while preserving state tort remedies that already existed at common law, providing that such remedies do not significantly impact federal deregulation.").

Furthermore, the fact that the ADA does not itself contain a remedy for personal injury claims also respectably supports an inference that Congress expected state tort actions to survive. Indeed, several other courts have considered Congress's failure to provide a remedy in the ADA persuasive

evidence of its lack of preemptive intent. In *Hodges,* for example, the court, quoting *Silkwood v. Kerr–McGee Corp.,* stated: "It is difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct." 44 F.3d at 338 (quoting *Silkwood,* 464 U.S. at 251, 104 S.Ct. 615). Likewise, in *Margolis v. United Airlines, Inc.,* the court, in rejecting the airline's express preemption argument, wrote: "Because Congress has not provided any remedy for an airline passenger who suffers personal injury due to the negligence of the airline and its employees, preemption should not apply to a claim under common law negligence to recover for personal injury." 811 F.Supp. 318, 324–25 (E.D.Mich.1993).

In addition, other courts have stressed that Congress' silence on the subject of safety in the ADA's express preemption provision also significantly suggests that Congress did not intend to preempt personal injury claims relating to safety. *See e.g., Dudley v. Business Express, Inc.,* 882 F.Supp. 199, 206 (D.N.H. 1994) ("This court's own research indicates that since Congress omitted 'safety' from the language of section [41713], personal injury actions premised on state law which seek compensation for an airline's alleged negligence fall outside the sweep of the preemption provision of section [41713]."). *See also Rivera v. Delta Air Lines, Inc.,* No. CIV. A.96–1130, 1997 WL 634500 (E.D.Pa. Sept.26, 1997) (finding that Congress' omission of "safety" or a similar term in the preemption provision persuasive evidence that Congress did not intend to preempt state law negligence claims).

United's view that Congress' deregulatory goal of avoiding patchwork regulation of airlines compels the conclusion that it must have had an expansive view of airline "services" is without merit. It fails to recognize that *all* state claims, whether they have the "forbidden significant effect" on "rates, routes, or services" or not, potentially subject airlines to patchwork regulation. Indeed, literally applied, United's definition of "services" amounts to an argument for total preemption—a proposition that has been rejected by the Supreme Court. *See Wolens,*

513 U.S. at 234, 115 S.Ct. 817 (majority opinion) (responding to the dissent's total preemption argument).

The cases, which hold state common law personal injury claims to be preempted under the ADA, are unhelpful to United. They do not indicate in any way that Congress intended total preemption and are distinguishable because in each of them, as distinct from the present case, the allegedly tortious conduct involved the statutory provision of "services." *See e.g., Smith v. Comair, Inc.,* 134 F.3d 254 (4th Cir.1998) (ADA preempted passenger's intentional tort allegations to the extent they were premised on airline's refusal to permit him to board his flight); *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia,* 73 F.3d 1423 (7th Cir.1996) (plaintiff's tortious interference, intentional infliction of emotional distress, and fraud claims were preempted where based on airline's refusal to transport passengers); *Chukwu v. Board of Directors of British Airways,* 889 F.Supp. 12 (D.Mass.1995) (plaintiff's slander and intentional infliction of emotional distress claims were preempted because denial of the right to board airplane, even if wrongful, related directly to airline "services"). In each of these cases, the alleged tortious conduct primarily related to the denial of boarding and the refusal to transport a particular passenger, both of which, without question, are at the heart of the "services" that airlines provide. Because they fall within any reasonable understanding of "services" including both the Fifth and Ninth Circuit's definitions of "services," they do not present any sort of obstacle to finding in Somes' favor.

In sum, because a requirement that airlines equip flights with enhanced emergency medical kits is distinct from the "services" Congress had in mind when it adopted the ADA's preemption provision, and does not have a "forbidden significant effect" on airline "rates, routes, or services," it is not expressly preempted.

## V. *Implied Preemption: Federal Aviation Act of 1978*

 United contends that, even if not expressly preempted by the ADA, Somes' claim is preempted by implication.[2] Implied preemption occurs in two varieties: (1) Field preemption, which occurs when a comprehensive scheme of federal regulation in a particular field gives rise to the inference that Congress left no room for the states to supplement it, *Rice,* 331 U.S. at 230, 67 S.Ct. 1146, and (2) conflict preemption, which arises when compliance with state law "stands as an obstacle to the accomplishment of the full purpose and objectives of Congress," or when compliance with both federal and state law is "physically impossible," *Silkwood,* 464 U.S. at 248, 257, 104 S.Ct. 615. As with express preemption, if the allegedly preempted action involves public health, welfare, or safety, matters which the states have traditionally regulated, "congressional intent to supersede state laws must be 'clear and manifest'" before a claim will be held impliedly preempted. *Philip Morris v. Harshbarger,* 122 F.3d 58, 86 (1st Cir.1997) (quoting *English v. General Elec. Co.,* 496 U.S. 72, 79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990) (in turn quoting *Rice,* 331 U.S. at 230, 67 S.Ct. 1146)). "The mere fact that Congress has enacted detailed legislation addressing a matter of dominant federal interest does not indicate an intent to displace state law entirely." *Cleveland v. Piper Aircraft Corp.,* 985 F.2d 1438, 1441 (10th Cir.1993) (quoting *English,* 496 at 87, 110 S.Ct. 2270).

### A. *Field Preemption*

 United seems to argue that Somes' claim is impliedly preempted by the Federal Aviation Act because her claim encroaches upon a comprehensive scheme of regulation

2. Somes' assertion that the question of implied preemption need not be reached is without merit. In *Freightliner v. Myrick,* the Supreme Court held that the existence of an express definition of preemption does not "entirely foreclose[ ] any possibility of implied preemption." 514 U.S. 280, 288, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995). Rather, when a state claim is not expressly preempted, the existence of that express definition " 'implies'—i.e., supports a reasonable inference—that Congress did not intend to preempt other matters." *Id.* Accordingly, although this opinion holds that Somes' claim is not expressly preempted, it is nevertheless appropriate to reach United's implied preemption arguments—albeit, with a thumb on the scale in favor of finding no intent to preempt.

in the field of aircraft safety. It submits that Congress' preemptive intent with respect to Somes' claim is found in the legislative history of the statute, in the existence of an intricate web of statutory provisions governing "air safety," and in the Federal Aviation Administration's ("FAA") comprehensive safety regulations governing aircraft design and performance, inspection and maintenance, pilot performance, and, perhaps, most significant, emergency medical kits.

Congress enacted the Federal Aviation Act "to promote safety in aviation and thereby protect the lives of persons who travel on air board aircraft." *In re Mexico City Aircrash of October 31, 1979*, 708 F.2d 400, 406 (9th Cir.1983). As explained by the Second Circuit, the statute "was passed by Congress for the purpose of centralizing in a single authority—indeed, in one administrator—the power to frame rules for the safe and efficient use of the nation's airspace." *Air Line Pilots Ass'n Int'l v. Quesada*, 276 F.2d 892, 894 (2d Cir.1960).

Congress' concern with safety in air transportation is evident throughout the Federal Aviation Act. The statute directs the Secretary of Transportation to "assign[ ] and maintain[ ] safety as the highest priority in air commerce," 49 U.S.C. § 40101(a)(1), and to "prevent[ ] deterioration in established safety procedures, recognizing the clear intent, encouragement, and dedication of Congress to further the highest degree of safety in air transportation and air commerce, and to maintain the safety vigilance that has evolved in air transportation and air commerce and has come to be expected by the traveling and shipping public," 49 U.S.C. § 40101(a)(3). It further instructs the Administrator of the FAA in carrying out its duties "to ensure the safety of aircraft and the efficient use of airspace" 49 U.S.C. § 40103(b)(1), and grants the Administrator broad authority to regulate air safety, 49 U.S.C. § 44701(a). In particular, the FAA is authorized to prescribe minimum standards "for other practices, methods, and procedure [it] finds necessary for safety in air commerce and national security." 49 U.S.C. § 44701(a)(5).

The Administrator of the FAA has exercised this broad authority and adopted comprehensive rules and regulations reflecting Congress' concern with air safety. *See generally*, 14 C.F.R. pt. 121 (1998). In particular, 14 C.F.R. §§ 121.309 and 121.310 specify the requisite "emergency equipment." Airlines are required to carry hand fire extinguishers, 14 C.F.R. § 121.309(c), and a crash ax, 14 C.F.R. § 121.309(e). Each plane must have an approved means of evacuation in the case of an emergency. 14 C.F.R. § 121.310(a). The interior emergency exits and, in particular, their operating handles must be conspicuously marked. 14 C.F.R. § 121.310(b), (e). The emergency lighting system is required to be sufficiently independent of the main lighting system. 14 C.F.R. § 121.310(c). The regulations also prescribe detailed rules for insuring that passengers have access to emergency exits. 14 C.F.R. § 121.310(f). In addition, the regulations require that every passenger-carrying airplane have an emergency medical kit equipped with the items set forth in Appendix A of Part 121 "for treatment of injuries or medical emergencies that might occur during flight time." 14 C.F.R. § 121.309(d). Specifically, no airplane can be operated unless it is in compliance with the FAA's equipment regulations. 14 C.F.R. § 121.309(a).

Indeed, Congress' concern for "air safety" played a part in the Supreme Court's holding in the seminal case, *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973), and was central to the First Circuit's decision in *French v. Pan Am Express*, 869 F.2d 1 (1st Cir.1989). In *City of Burbank*, a city ordinance prohibited aircraft from taking off between the hours of 11 p.m. of one day and 7 a.m. the next day. 411 U.S. at 625, 93 S.Ct. 1854. The Court held that the ordinance was preempted based on the "pervasive nature of the scheme of federal regulation of aircraft noise." *Id.* at 633, 93 S.Ct. 1854. It noted that the field of aircraft noise "require[d] a uniform and exclusive system of federal regulation if the congressional objectives underlying the Federal Aviation Act [we]re to be fulfilled." *Id.* at 639, 93 S.Ct. 1854. It observed that "[i]f we were to uphold the Burbank ordinance and a significant number of

municipalities followed suit, it is obvious that fractionalized control of the timing of take-offs and landings would severely limit the flexibility of FAA in controlling air traffic flow. The difficulties of scheduling flights to avoid congestion and the concomitant decrease in safety would be compounded." *Id.*

In *French,* an airplane pilot sought to enforce provisions of a Rhode Island statute, which regulated the circumstances under which employers could require workers to submit to drug testing. 869 F.2d at 1–2. The court held that under the Act the pilot's action was "field" preempted because the "intricate web of statutory provisions afford[ed] no room for the imposition of state-law criteria vis-a-vis pilot suitability." *Id.* at 4. In holding the plaintiff's claim preempted, the court, emphasizing Congress' safety objectives, noted: "It is hard to imagine an area of regulation that is more closely related to air safety than pilot qualifications. And local restrictions would make impossible the attainment of the centralized control and uniformity of design so plainly coveted by Congress." *Id.* at 5–6.

Notwithstanding Congress' indication that air safety was of paramount importance to it, neither the Federal Aviation Act nor the regulations promulgated thereunder suggest that it was Congress' "clear and manifest" purpose to preempt the type of claim Somes asserts. In other words, even if Congress intended to preempt the field of "air safety," an issue we need not decide, Somes' claim is not preempted because it falls outside the regulated field.

The statutory provisions and the FAA regulations, upon which United relies, as evincing Congress' concern with "air safety," relate exclusively to matters inherent in the nature of airline operations (with the exception of the regulations specifically delineating the required contents of in-flight emergency medical kits). They address "safety" only in so far as it relates to the actual transportation of passengers to and from their destinations. They simply do not involve the health and medical needs of individual passengers, and therefore, do not suggest a congressional intent to preempt Somes' claim.

Neither do the regulations delineating the required contents of in-flight emergency medical kits provide a basis for finding a "clear and manifest" purpose to preempt the field of emergency medical equipment. Although the regulations do prescribe items that airlines are obliged to include in emergency medical kits, they merely set forth minimum requirements. 14 C.F.R. § 121 app. A (1996) ("[T]he approved emergency medical kit must contain, *as a minimum,* the following appropriately maintained contents in specified quantities . . . .") (emphasis added). Minimum requirements, by definition, permit and authorize the party to whom they apply to exceed the minimum. Thus, the emergency medical kit regulations themselves do not bar the airline from carrying supplemental devices to protect its passengers, or state law from requiring more of airlines.

In sum, Congress' regulatory scheme with respect to air transportation and safety is not so pervasive as to make reasonable the inference that Congress left no room for the states to supplement it. A requirement that airlines carry a defibrillator does not implicate "air safety" as understood and focused on by Congress in its enactment of the Federal Aviation Act, and therefore is not preempted.

## B. *Conflict Preemption*

 United also suggests that even if Somes' claim is not barred under "field" preemption, her claim is impliedly preempted under a "conflict" theory. United makes much ado about the requirement that the contents of emergency medical kits be "approved" by the FAA. *See* 14 C.F.R. pt. 121, app. A. It argues that an airline could find itself in the position of complying with a state common law duty requiring airlines to carry defibrillators and other medical equipment for treating heart attacks and simultaneously violating a federal requirement because it had not yet secured FAA approval for enhancing its emergency medical kits.

United's argument is premature. A requirement that an airline secure FAA approval before enhancing its in-flight emergency medical kit cannot be said to conflict

with a state common law duty that airlines carry defibrillators until and unless the FAA declines to approve the fulfillment of the state requirement. There is nothing in the present record to suggest that the FAA has denied or would deny approval for such an enhanced emergency medical kit.

The argument is also disingenuous. Several domestic airlines, including United itself, have actually installed or announced plans to install defibrillators in their aircraft. Cliff Edwards, *United to Join Other Airlines in Carrying Defibrillators*, The Boston Globe, Feb. 14, 1993, at E3.

Furthermore, permitting Somes' claim to proceed does not "stand as an obstacle" to fulfillment of federal objectives. There is nothing in the record to suggest that a common law duty requiring airlines to carry defibrillators is in tension with Congress' safety concerns. In *Cleveland,* the Tenth Circuit rejected a similar assertion in a negligent design case, holding that the plaintiff's claim was not preempted because it was not impossible for the defendant to comply with federal regulations and undertake additional safety measures. 985 F.2d at 1445.

\* \* \* \* \* \*

For the foregoing reasons, the defendant's motion to dismiss is denied.

It is so ordered.