**Jason WOLFSON, et al, Plaintiffs,**

v.

**AMERICAN AIRLINES, INC., et al, Defendants.**

**No. 00–CV–11802–PBS.**

United States District Court,
D. Massachusetts.

Sept. 28, 2001.

---

James S. Murphy, Brockton, MA, for Plaintiffs.

James W. Matthews, Sherin and Lodgen LLP, Boston, MA, for American Airlines, Inc., Gerald J. Carty, defendants.

Harold L. Lichten, Pyle, Rome, Lichten & Ehrenberg, P.C., Boston, MA, Kathy L. Krieger, James & Hoffman, PC, Washington, DC, for Allied Pilots Ass'n, Richard T. Lavoy, defendants.

### MEMORANDUM AND ORDER

SARIS, District Judge.

When the Allied Pilots Association, the exclusive bargaining agent for American Airlines' pilots, failed to halt an illegal "sick-out" in early February, 1999 in violation of a temporary restraining order, plaintiffs were among the members of the public who paid part of the price. Like hundreds of other ticketed passengers, their flight was canceled as a result of the sick-out. They bring suit against American Airlines, the Allied Pilots Association, and its president Richard LaVoy, for tortious interference with contractual relations. Defendants Allied Pilots Association and Richard T. Lavoy have moved to dismiss on a variety of grounds. For the reasons stated below, the Court **ALLOWS** the motion of defendant Richard T. Lavoy and **DENIES** the motion of defendant Allied Pilots Association.

### I. BACKGROUND

Many of the key facts that gave rise to this case are succinctly summarized in *In*

*re Allied Pilots Class Action Litigation,* No. CIV.A. 3:99–CV–0480P, 2000 WL 1405235, at *1 (N.D.Tex. Sept.26, 2000), *appeal pending,* No. 00–11223 (5th Cir. argued Sept. 6, 2001) (a proposed class action asserting state and federal claims on behalf of ticketed passengers whose flights were delayed or canceled as a result of the sick-out).[1] For a more comprehensive history, *see American Airlines, Inc. v. Allied Pilots Ass'n.,* 53 F.Supp.2d 909, 914–17 (N.D.Tex.1999). A brief synopsis will suffice for the purposes of this Court.

In 1998, a dispute arose over the terms of the collective bargaining agreement between American Airlines and the Allied Pilots Association ("the APA"), the exclusive bargaining agent for the airline's pilots. As a result of the dispute, the APA staged a sick-out from February 6, 1999 through February 9, 1999, resulting in the cancellation of more than 1600 American flights. On February 10, 1999, Judge Kendall of the Northern District of Texas issued a temporary restraining order ("the TRO") prohibiting the union and its officers from "calling, permitting, instigating, authorizing, encouraging, participating in, approving or continuing any interference with American's airline operations, including but not limited to any strike, work stoppage, sick-out, slowdown or other concerted refusals to fly over a minor dispute or otherwise in violation of the [Railway Labor Act], 45 U.S.C. §§ 151–188 (1988)." *American Airlines,* 53 F.Supp.2d at 918 (quoting language from the TRO).

The day after the TRO was issued, the number of canceled flights increased. On February 12, 1999, Judge Kendall found that defendants APA and LaVoy (and a third defendant not a party to the case before this Court) acted in concert in vio-

lating the TRO. Judge Kendall held all three defendants jointly and severally liable for $45,507,280.00 in "lost revenue, unnecessary costs and expenses" incurred by American as a consequence of the TRO violation. *American Airlines,* 53 F.Supp.2d at 937.

The plaintiffs filed a Complaint and Demand for Jury Trial on September 5, 2000, alleging that they were booked on an American Airlines flight scheduled to travel from Boston's Logan Airport to San Juan, Puerto Rico on February 12, 1999, and that their flight was canceled as a result of the sick-out. This cancellation disrupted their vacation plans and forced them to incur additional expense. Plaintiffs seek money damages for the expenses they incurred after being denied passage on their original flight, plus interests and costs.

On December 1, 2000, defendants APA and Richard T. Lavoy filed a motion to dismiss, arguing that three separate strands of federal preemption doctrine bar the plaintiffs' claims against them (Mem. Law Supp. Mot. Dismiss at 5–21). They also cite two additional grounds for dismissal of the claims against Richard T. Lavoy: his immunity from personal liability for acts performed on the union's behalf; and the absence of personal jurisdiction (Mem. Law Supp. Mot. Dismiss at 21–23).

## II. ANALYSIS

### A. Motion to dismiss standard

For purposes of this motion, the Court takes as true "the well-pleaded facts as they appear in the complaint, extending [the] plaintiff[s] every reasonable inference

---

**1.** In both district and circuit court filings, this case carries the name of its lead plaintiff, and is entitled *Kaufman v. Allied Pilots Ass'n.*

in [their] favor." *Coyne v. City of Somerville*, 972 F.2d 440, 442–43 (1st Cir.1992) (citing *Correa–Martinez v. Arrillaga–Belendez*, 903 F.2d 49, 51 (1st Cir.1990)). A complaint should not be dismissed under Fed.R.Civ.P. 12(b)(6) unless " 'it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief.' " *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 25 (1st Cir.1987) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

## B. Federal Preemption

### (i) *Garmon/Jacksonville Preemption*

■ The defendants offer three distinct arguments based on theories of federal preemption to justify the dismissal of the suit. First, defendants argue that the claim of tortious interference with contract is preempted by the Railway Labor Act ("the RLA") under *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 244, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959) (finding state tort claims were preempted where union picketing was arguably within the scope of the National Labor Relations Act sections on collective bargaining and unfair labor practices); and *Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 385, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969) ("State courts may not enjoin a peaceful strike by covered railway employees [under the RLA], no matter how economically harmful the consequences may be."). *See also United Mine Workers v. Gibbs*, 383 U.S. 715, 729, 742, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) (holding that court may not award tort damages under state law for non-violent illegal strike). Defendants argue that the *Garmon/Jacksonville* preemption doctrine bars a state-law remedy for a non-violent work stoppage, such as the sick-out at issue in this case.

■ While the *Garmon/Jacksonville* preemption doctrine lends great credence to defendants' position, "the same considerations that underlie the Garmon rule have led the Court to recognize exceptions in appropriate classes of cases." *Farmer v. United Brotherhood of Carpenters & Joiners*, 430 U.S. 290, 296, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977). *Garmon* itself noted that the court may not "find withdrawal from the States of power to regulate where the activity regulated was a merely peripheral concern of the Labor Management Relations Act .... [o]r where the regulated conduct touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act." *Garmon*, 359 U.S. at 243–44, 79 S.Ct. 773. One such exception is labor disputes involving "violence and threats of violence." *Gibbs*, 383 U.S. at 729, 86 S.Ct. 1130. Other noteworthy examples of non-preempted claims include malicious libel, *see Linn v. United Plant Guard Workers Local 114*, 383 U.S. 53, 54, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966); intentional infliction of emotional distress, *see Farmer*, 430 U.S. at 302, 97 S.Ct. 1056; and vandalism, *see Cranshaw Constr. of New England, L.P. v. Int'l Ass'n of Ironworkers Local 7*, 891 F.Supp. 666, 675 (D.Mass.1995).

The question is twofold. First, is conduct undertaken *after* the issuance of a temporary restraining order a concern sufficiently peripheral to federal labor law that the courts should not infer that Congress intended to deprive the states of the power to act? Second, does the state have a strong local interest in protecting consumers who have entered into contracts for airline transportation? I conclude that the answer to both questions is yes. The common law remedy here of intentional

interference with contract is not designed to sanction labor violations, but is a generally applicable tort to protect private expectations arising from binding contracts. *See New York Tel. Co. v. New York State Dept. of Labor,* 440 U.S. 519, 533, 99 S.Ct. 1328, 59 L.Ed.2d 553 (1979) ("[O]ur cases have consistently recognized that a congressional intent to deprive the States of their power to enforce such general laws is more difficult to infer than an intent to preempt laws directed specifically at concerted activity.") If the purpose of the common law remedy were to deter labor law violations and to reward "fidelity to the law," the remedy would be preempted. *See Wisconsin Dep't. of Indus., Labor and Human Relations v. Gould Inc.,* 475 U.S. 282, 287, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986) (preempting state debarment statute which precludes a firm from competing for state business if it violates the NLRA three times). To be sure, *Gibbs* noted specifically the danger presented by the anti-labor uses to which the tort of malicious interference with contract could be put, and precluded such private tort remedies for unlawful, peaceful (as opposed to violent) strike activity. 383 U.S. at 732 n. 19, 86 S.Ct. 1130. However, *Gibbs* did not involve strike conduct that post-dated a federal court determination of unlawfulness.

■ While the question is close because the sick-out was peaceful, not violent, the Court is persuaded that conduct undertaken in violation of a court order is an exception to the otherwise sweeping scope of *Garmon* preemption. The state's interest in protecting innocent consumers who have a contract with the airlines is at least as strong as its interest in protecting its citizens from libel. Once a court has issued a determination of unlawfulness under the RLA, there is little risk of interference with the goals of federal labor laws. This

conclusion has been cogently elaborated in *In re Allied Pilots,* 2000 WL 1405235, at *7–10. There, Judge Solis persuasively reasoned:

> As discussed above, a [temporary restraining order] must be obeyed until set aside. Thus, neither a union nor an employer may have any reasonable expectation or good faith belief that its conduct in violation of the TRO is legal, let alone legally protected by federal labor policy. Those who violate a court order do so at their peril, and merit no federal license to continue engaging in conduct that violates the rights of third parties even after a judge has forbidden them to do so. Further, there is no ambiguity in a rule refusing to exempt post-TRO conduct from valid state laws not implicating a [collective bargaining agreement]. The clear bright line is crossed only when a party continues to act contrary to state law after a court has forbidden such conduct by issuing a restraining order or injunction. There can be no confusion that such conduct no longer enjoys special legal protection.

*Id.* at *9. Although violation of a TRO should not give third parties *carte blanche* to bring claims against a union for all labor-related conduct occurring thereafter, plaintiffs in this case have brought a claim for tortious interference with contract under Massachusetts law solely for conduct specifically banned by the TRO. *See Draghetti v. Chmielewski,* 416 Mass. 808, 816, 626 N.E.2d 862, 868 (1994) (enumerating four elements of tort of unlawful interference with contractual relations under Massachusetts law: existence of contract with third party; defendant's knowing inducement of third party to break contract; impropriety of interference in motive or means; and harm to plaintiff from defendant's actions.)

#### (ii) *Lingle/Norris Preemption*

■ Defendants' second line of preemption defense is grounded in *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 413, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988) (holding state law claims preempted "only if such application requires the interpretation of a collective-bargaining agreement") and *Hawaiian Airlines v. Norris*, 512 U.S. 246, 263, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994) (applying same preemption principles under the Railway Labor Act). Defendants contend that because plaintiffs' claims require interpretation of the collective bargaining agreement ("the CBA"), they are barred under the *Lingle/Norris* preemption doctrine.

This argument is not persuasive when applied to defendants' post-TRO conduct. Three of the four elements of the tortious interference claim under Massachusetts law do not rely on interpretation of the CBA: that a contract between plaintiffs and a third party (American Airlines) existed; that the defendants knowingly induced the third party to break the contract; and that the plaintiff was harmed by defendant's actions. *See Draghetti,* 416 Mass. at 816, 626 N.E.2d at 868.

■ The final element requires plaintiff to prove that "the defendant's interference, in addition to being intentional, was improper in motive or means." *Id.* This element of the claim still does not run afoul of *Lingle/Norris* preemption because "[o]rdinarily, parties should always obey the court's orders, regardless of whether they think the orders are correct. . . . [t]he terms of a CBA, a contract between labor and management, offer no legal justification for violating a court order under any interpretation." *In re Allied Pilots,* 2000 WL 1405235, at *5 (citations omitted). Violating a court order certainly constitutes an "improper . . . means" under state law. Although "justification for one's conduct is

an affirmative defense to be proved by the defendant," *United Truck Leasing Corp. v. Geltman,* 406 Mass. 811, 812, 551 N.E.2d 20, 21 (1990), this does not save defendants' preemption argument because "once Judge Kendall issued the TRO, his order trumped any possible justification defense based upon the rights conferred by the CBA." *In re Allied Pilots,* 2000 WL 1405235, at *5 (citations omitted). None of the four elements of plaintiffs' tortious interference claim hinges on an interpretation of the CBA, making the *Lingle/Norris* doctrine inapplicable to their suit.

#### (iii) *Preemption under the Airline Deregulation Act of 1978*

■ The defendants' third preemption argument relies on the Airline Deregulation Act of 1978 ("the ADA"), Pub.L. No. 95–504, 92 Stat. 1705 (1978) (codified as amended in various sections of Title 49). The statute reads, in pertinent part, "States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1). Congress left in place a savings clause from the Federal Aviation Act of 1958. *See* 49 U.S .C. § 40120(c) ("A remedy under this part is an addition to any other remedies provided by law.") Defendants note that several courts have construed a "service" under the ADA to include both the "bargained-for or anticipated provision of labor from one party to another" and "the transportation itself." *Hodges v. Delta Airlines, Inc.,* 44 F.3d 334, 336 (5th Cir.1995); *Somes v. United Airlines, Inc.,* 33 F.Supp.2d 78, 83 (D.Mass.1999) (holding that the term "services" is "restricted to items which are regular, recurrent, or necessary features of actual flight or airline operations"). Insofar as plaintiffs' claim for tortious interference rests on Allied

Pilots' non-provision of labor and American's consequent failure to provide air transportation, defendants argue, it "relates to" the provision of air services and should be preempted.

▇▇▇▇ Defendants' mechanistic construction does not accurately reflect the caselaw on ADA preemption. "Preemption fundamentally is a question of congressional intent...." *English v. General Electric Co.*, 496 U.S. 72, 78–79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990). "A cardinal rule of preemption analysis is 'the starting presumption that Congress d[id] not intend to supplant state law.'" *Somes*, 33 F.Supp.2d at 80 (quoting *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995)). Congress passed the Airline Deregulation Act in the belief that " 'maximum reliance on competitive market forces' would best further 'efficiency, innovation, and low prices,' as well as 'variety [and] quality ... of air transportation services.'" *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) (citing former 49 U.S.C. §§ 1302(a)(4), 1302(a)(9)). The goal was to ensure that the States "would not undo federal deregulation with regulation of their own ...." *Id.* In other words, "the ban on enacting or enforcing any law 'relating to rates, routes or services' is most sensibly read, in light of the ADA's overarching deregulatory purpose, to mean 'States may not seek to impose their own public policies or theories of competition or regulation on the operations of an air carrier.'" *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 229 n. 5, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995) (citations omitted).

Defendants do not convincingly demonstrate that permitting plaintiffs to pursue their claim would undermine the purposes of the Act—to maximize reliance on competitive market forces. Plaintiffs' suit is based on an illegal sick-out by a union in violation of a temporary restraining order, which may support a claim for tortious interference with contract under state law. Permitting plaintiffs to seek damages against a union for such illegal conduct does not interfere with the deregulation and/or competitiveness of the airline industry to any appreciable degree.

The fact that plaintiffs' claim arguably "relates to" the provision of air services does not alter this conclusion. The Supreme Court has expressly cautioned that " '[s]ome state actions may affect [airline fares] in too tenuous, remote, or peripheral a manner' to have pre-emptive effect." *Morales*, 504 U.S. at 390, 112 S.Ct. 2031 (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 100, n. 21, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983)). Courts have applied the *Morales* limitation on a case-by-case basis, to determine whether particular claims fall within the ambit of the ADA. *See, e.g., Smith v. Comair, Inc.*, 134 F.3d 254, 259 (4th Cir.1998) (holding that intentional tort claims were not preempted to extent they did not relate to airlines' decision to deny passenger permission to board); *Abdu–Brisson v. Delta Airlines, Inc.*, 128 F.3d 77, 85 (2d Cir.1997) (holding that ADA did not bar a pilot's claim of age discrimination against a union); *Somes*, 33 F.Supp.2d at 85, 87 (holding that wrongful death claim arising from a lack of medical equipment was neither expressly nor impliedly preempted by ADA). Most importantly, in *Wolens*, 513 U.S. at 232, 115 S.Ct. 817, the Supreme Court declined to extend *Morales* to preempt simple common law breach of contract claims, stating:

Nor is it plausible that Congress meant to channel into federal courts the business of resolving, pursuant to judicially fashioned federal common law, the range of contract claims relating to air-

line rates, routes, or services. The ADA contains no hint of such a role for the federal courts.

While *Wolens* did preempt claims under the Illinois Consumer Fraud Act, 815 Ill. Comp. Stat. § 505/2 (1992), the Court explained: "The ADA's preemption clause, § 1305(a)(1), read together with the FAA's saving clause, stops states from imposing their own substantive standards with respect to rates, routes or services, but not from affording relief to a party who claims and proves that an airline dishonored a term the airline itself stipulated." *Id.* at 232–233, 115 S.Ct. 817. Essentially, the Supreme Court has charted a "middle course" in drawing the line between "what the ADA preempts, and what it leaves to private ordering, backed by judicial enforcement." *Id.* at 234, 115 S.Ct. 817.

In light of the purposes of the ADA and the policies outlined in *Morales* and *Wolens*, I am persuaded that preemption of the tort of interference with contract brought by a third party, not an air carrier, would stray from the middle course charted by the Supreme Court. Permitting third parties to sue a union for tortious interference with contract, based on conduct expressly barred by and occurring after the issuance of a TRO, might conceivably affect a "price, route, or service" of an air carrier, but the causal connection is far too "tenuous, remote, [and] peripheral" to warrant preemption in this case. *Morales,* 504 U.S. at 390, 112 S.Ct. 2031.

## C. Immunity

The remaining two grounds for dismissal apply only to Richard T. Lavoy, president of Allied Pilots at the time of the present action. Mr. Lavoy claims that as an APA officer, he cannot be held personally liable for damages arising from a federally prohibited sick-out. He also claims that he is not subject to the personal jurisdiction of this Court.

The immunity of individual union officers from liability for union activities in the collective bargaining context has long been an important fixture of Federal labor policy. *See Atkinson v. Sinclair Refining Co.,* 370 U.S. 238, 249, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962) (barring action by employer against union officers for breach of a no-strike agreement pursuant to § 301 of the Taft–Hartley Act, 29 U.S.C. § 185); *Complete Auto Transit, Inc. v. Reis,* 451 U.S. 401, 417, 101 S.Ct. 1836, 68 L.Ed.2d 248 (1981) (holding that damages immunity remained in effect even if the union had not authorized the actor's conduct); *Montplaisir v. Leighton,* 875 F.2d 1, 4 (1st Cir.1989) (barring suit against union's lawyers by union members). In construing § 301(b) of the Labor Management Relations Act, 29 U.S.C. § 185(b),[2] the Supreme Court held:

> [T]he union as an entity, like a corporation, should in the absence of agreement be the sole source of recovery for injury inflicted by it . . . . This policy cannot be evaded or truncated by the simple device of suing union agents or members, whether in contract or tort, or both, in a separate count or in a separate action for damages for violation of a collective bargaining contract for which damages the union itself is liable.

*Atkinson,* 370 U.S. at 249, 82 S.Ct. 1318 (citations omitted). The First Circuit has emphasized *Atkinson*'s broad sweep, observing that "[w]ith monotonous regulari-

---

**2.** 29 U.S.C. § 185(b) reads, in pertinent part, "Any money judgment against a labor organization in a district court of the United States shall be enforceable only against the organi-zation as an entity and against its assets, and shall not be enforceable against any individual member or his assets."

ty, court after court has cited *Atkinson* to foreclose state-law claims, however inventively cloaked, against individuals acting as union representatives within the ambit of the collective bargaining process." *Montplaisir*, 875 F.2d at 4. These principles apply to a dispute, like this one, arising under the Railway Labor Act. *See Arnold v. Air Midwest, Inc.*, 100 F.3d 857, 861 (10th Cir.1996).

One unusual facet of the present case merits special consideration. In the original Texas litigation between American Airlines and Allied Pilots, Judge Kendall held two officers of the union (including Mr. LaVoy) personally liable in civil contempt proceedings for evading compliance with the temporary restraining order he had issued. *See American Airlines*, 53 F.Supp.2d at 941. Rejecting an argument under *Reis* and *Atkinson* that a contempt finding against individual union officials would conflict with federal policy, the Texas court was careful to note that "the money is not being ordered paid [by the individual union officers] because of the illegal work stoppage, but for the damages caused by not ending it *when ordered to do so by a federal judge.*" *Id.* at 941 (emphasis added). The Court held LaVoy personally liable for civil contempt for violating the TRO.

■ However, *Atkinson* immunity extends to union officials even if they employ illegal strike tactics "to put coercive pressure on management and secure the union's bargaining objectives," *Montplaisir*, 875 F.2d at 7; even if the union did not authorize the agent's conduct, *see Reis*, 451 U.S. at 417, 101 S.Ct. 1836; and even if violent tactics are used, *see Prater v. United Mine Workers*, 793 F.2d 1201, 1206 (11th Cir.1986). Thus LaVoy, as the union's agent who was acting on its behalf, cannot be held personally liable for tortious interference with contract under

state law, even if the APA itself is shown to be guilty of such an offense. To hold otherwise would do violence to a "principle that has become so embedded in our jurisprudence that it brooks no serious challenge." *Montplaisir*, 875 F.2d at 4.

Because of this Court's finding that LaVoy is immune from personal liability, there is no need to address the closer issue of whether there is a sufficient basis for personal jurisdiction.

### III.  CONCLUSION AND ORDER

For the reasons stated above, Allied Pilot's motion to dismiss (Docket No. 10–1) is *DENIED.* Richard T. Lavoy's motion to dismiss is *ALLOWED.*